FORD MOTOR CREDIT CO. ET AL. *v.* MILHOLLIN* ET AL.

No. 78–1487.   Argued December 4, 1979—Decided February 20, 1980

---

*Although respondents spell their name "Millhollin," throughout this litigation their name has been misspelled as "Milhollin."  Because legal research catalogs and computers are governed by the principle of consistency, not correctness, we feel constrained to adhere to the erroneous spelling.

BRENNAN, J., delivered the opinion for a unanimous Court. BLACKMUN, J., filed a concurring opinion, in which BURGER, C. J., joined, *post*, p. 570.

*William M. Burke* argued the cause for petitioners. With him on the briefs were *George R. Richter, Jr., Ronald M. Bayer, Herbert H. Anderson,* and *John M. Berman.*

*Richard A. Slottee* argued the cause for respondents. With him on the brief were *William H. Clendenen, Jr.,* and *Richard Kanter.*

*Stuart A. Smith* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General McCree, Assistant Attorney General Shenefield, John J. Powers III,* and *Marion L. Jetton.*†

---

†Briefs of *amici curiae* urging reversal were filed by *Roland E. Brandel* for the California Bankers Association; by *Peter D. Schellie* and *Theodore R.*

Mr. Justice Brennan delivered the opinion of the Court.

The issue for decision in this case is whether the Truth in Lending Act (TILA), 82 Stat. 146, as amended, 15 U. S. C. § 1601 *et seq.*, requires that the existence of an acceleration clause always be disclosed on the face of a credit agreement. The Federal Reserve Board staff has consistently construed the statute and regulations as imposing no such uniform requirement. Because we believe that a high degree of deference to this administrative interpretation is warranted, we hold that TILA does not mandate a general rule of disclosure for acceleration clauses.

I

The several respondents in this case purchased automobiles from various dealers, financing their purchases through standard retail installment contracts that were assigned to petitioner Ford Motor Credit Co. (FMCC), a finance company. Each contract provided that respondents were to pay a precomputed finance charge. As required by TILA and Federal Reserve Board Regulation Z, which implements the Act, the front page of each contract disclosed and explained certain features of the agreement. See 15 U. S. C. § 1631; 12 CFR § 226.6 (a) (1979). Among these disclosures was a paragraph informing the buyer that he

> "may prepay his obligations under this contract in full at any time prior to maturity of the final instalment hereunder, and, if he does so, shall receive a rebate of the unearned portion of the Finance Charge computed under the sum of the digits method. . . ."

The face of the contract also stated that temporary default on a particular installment would result in a predetermined

*Boehm* for the Consumer Bankers Association; and by *William H. Allen* and *Vernon L. Evans* for the National Consumer Finance Association et al.

*Margaret S. Rigg* and *Willard P. Ogburn* filed a brief for the National Clients Council, Inc., as *amicus curiae* urging affirmance.

delinquency charge. Not mentioned on the disclosure page was a clause in the body of the contract giving the creditor a right to accelerate payment of the entire debt upon the buyer's default.[1]

Respondents subsequently commenced four separate suits against FMCC in the United States District Court for the District of Oregon, alleging, *inter alia,* that FMCC had violated TILA and Regulation Z by failing to disclose on the front page of the contract that the creditor retained the right to accelerate payment of the debt.[2] In two of the suits,[3] the District Court held that facial disclosure of the acceleration clauses was mandated by the provision of TILA that compels publication of "default, delinquency, or similar charges payable in the event of late payments," 15 U. S. C. §§ 1638 (a) (9), 1639 (a)(7). App. 30–31, 37, 69–71. Respondents in the other two actions prevailed on different grounds.[4] All four cases were consolidated on appeal to the Ninth Circuit.

The Court of Appeals agreed with the District Court that TILA imposes a general acceleration-clause disclosure requirement.[5] Rather than resting on the District Court's holding that acceleration is a default charge, however, the Court of Appeals based its decision on the narrower principle that under Regulation Z "[t]he creditor must disclose whether a rebate of unearned interest will be made upon acceleration

---

[1] "In the event Buyer defaults in any payment . . . Seller shall have the right to declare all amounts due or to become due hereunder to be immediately due and payable. . . ."

[2] The individual suits were *Milhollin* v. *Ford Motor Credit Co.,* Civ. No. 75–334 (1976); *Eaton* v. *Ford Motor Credit Co.,* Civ. No. 76–575 (1977); *Andresen* v. *Ford Motor Credit Co.,* Civ. No. 76–1090 (1977); and *Messinger* v. *Ford Motor Credit Co.,* Civ. No. 76–475 (1977).

[3] *Milhollin* and *Eaton, supra* n. 2.

[4] *Andresen* and *Messinger, supra* n. 2.

[5] The Court of Appeals rejected the grounds for TILA liability relied upon by the District Court in *Andresen* and *Messinger,* and remanded those two cases for consideration under the acceleration-clause theory.

and also disclose the method by which the amount of unearned interest will be computed if the debt is accelerated." 588 F. 2d 753, 757 (1978), quoting *St. Germain* v. *Bank of Hawaii,* 573 F. 2d 572, 577 (CA9 1977). See 12 CFR § 226.8 (b)(7) (1979). Implicit in the conclusion of the Court of Appeals—and explicit in its preceding *St. Germain* decision— was the rejection of a contrary administrative interpretation of the pertinent statutory and regulatory provisions. In adopting its particular approach, the Court of Appeals mapped a path through the disclosure thicket that diverges from the routes traveled by the Courts of Appeals for several other Circuits.[6] We granted certiorari, 442 U. S. 940 (1979), to resolve the conflict. We reverse.

## II

The Truth in Lending Act has the broad purpose of promoting "the informed use of credit" by assuring "meaningful disclosure of credit terms" to consumers. 15 U. S. C. § 1601. Because of their complexity and variety, however, credit transactions defy exhaustive regulation by a single statute. Congress therefore delegated expansive authority to

---

[6] The Courts of Appeals for the Eighth and Tenth Circuits have flatly declared that a creditor's rebate practice upon acceleration never need be disclosed. *Griffith* v. *Superior Ford,* 577 F. 2d 455 (CA8 1978); *United States ex rel. Hornell* v. *One 1976 Chevrolet,* 585 F. 2d 978 (CA10 1978). The Courts of Appeals for the Third and District of Columbia Circuits have held that acceleration rebate policies need not be separately disclosed when state law or the contract compels the creditor to rebate under acceleration, as under voluntary prepayment. *Johnson* v. *McCrackin-Sturman Ford, Inc.,* 527 F. 2d 257 (CA3 1975); *Price* v. *Franklin Investment Co.,* 187 U. S. App. D. C. 383, 574 F. 2d 594 (1978). The Court of Appeals for the Fifth Circuit has also adopted the position that separate disclosure is not required when the creditor is obliged to treat acceleration and voluntary prepayment alike for rebate purposes; that court has emphasized that the critical factor is the creditor's legal obligation to rebate, rather than its unbidden rebate policy. *McDaniel* v. *Fulton Nat. Bank,* 571 F. 2d 948 (en banc), clarified, 576 F. 2d 1156 (1978) (en banc).

the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit. 15 U. S. C. § 1604; *Mourning* v. *Family Publications Service, Inc.,* 411 U. S. 356 (1973). The Board executed its responsibility by promulgating Regulation Z, 12 CFR Part 226 (1979), which at least partly fills the statutory gaps. Even Regulation Z, however, cannot speak explicitly to every credit disclosure issue. At the threshold, therefore, interpretation of TILA and Regulation Z demands an examination of their express language; absent a clear expression, it becomes necessary to consider the implicit character of the statutory scheme. For the reasons following we conclude that the issue of acceleration disclosure is not governed by clear expression in the statute or regulation, and that it is appropriate to defer to the Federal Reserve Board and staff in determining what resolution of that issue is implied by the truth-in-lending enactments.

Respondents have advanced two theories to buttress their claim that the Act and regulation expressly mandate disclosure of acceleration clauses. In the District Court, they contended that acceleration clauses were comprehended by the general statutory prescription that a creditor shall disclose "default, delinquency, or similar charges payable in the event of late payments," 15 U. S. C. §§ 1638 (a)(9), 1639 (a)(7), and were included within the provision of Regulation Z requiring disclosure of the "amount, or method of computing the amount, of any default, delinquency, or similar charges payable in the event of late payments," 12 CFR § 226.8 (b)(4) (1979). Before this Court, respondents follow the Court of Appeals in arguing that 12 CFR § 226.8 (b)(7) may be the source of an obligation to disclose procedures governing the rebate of unearned finance charges that accrue under acceleration. That section commands

"[i]dentification of the method of computing any unearned portion of the finance charge in the event of prepayment in full of an obligation which includes pre-

computed finance charges and a statement of the amount or method of computation of any charge that may be deducted from the amount of any rebate of such unearned finance charge that will be credited to an obligation or refunded to the customer."

A fair reading of the pertinent provisions does not sustain respondents' contention that acceleration clauses are within their terms.

An acceleration clause cannot be equated with a "default, delinquency, or similar charg[e]," subject to disclosure under 15 U. S. C. §§ 1638 (a)(9), 1639 (a)(7), and 12 CFR § 226.8 (b)(4). The prerogative of acceleration affords the creditor a mechanism for collecting the outstanding portion of a debt on which there has been a partial default. In itself, acceleration entails no monetary penalty, although a creditor may independently impose such a penalty, for example, by failing to rebate unearned finance charges. A "default, delinquency, or similar *charg[e]*," on the other hand, self-evidently refers to a specific assessable sum. Thus, within the trade, delinquency charges are understood to be "the *compensation* a creditor receives on a precomputed contract for the debtor's delay in making timely instalment payments," 1 CCH Consumer Credit Guide ¶¶ 4230, 4231 (1977) (emphasis added). Acceleration is not compensatory; a creditor accelerates to avoid further delay by demanding immediate payment of the outstanding debt. See *id.*, ¶ 4231; Uniform Consumer Credit Code of 1968, § 2.203, official comment 2, 7 U. L. A. 315–316 (1978); § 2.204 (3), *id.*, at 317.

The language employed in TILA §§ 1638 (a)(9) and 1639 (a)(7), and in 12 CFR § 226.8 (b)(4) (1979), confirms the interpretation of "charges" as specific penalty sums. The statutory provisions speak of "charges *payable* in the event of late payments." (Emphasis added.) Even if one considers the burdensomeness of acceleration as a form of "charge" upon the debtor, it would hardly make sense to speak of

that burden as "payable" to the creditor. Similarly Regulation Z orders disclosure of the *"amount, or method of computing the amount,* of any default, delinquency, or similar charges. . . ." (Emphasis added.) That command has no sensible application to the remedy of acceleration. In short, we would have to stretch these provisions beyond their obvious limits to construe them as a mandate for the disclosure of acceleration clauses.[7]

The prepayment rebate disclosure regulation, 12 CFR § 226.8 (b)(7) (1979), also fails to afford direct support for an invariable specific acceleration disclosure rule. To be sure, payment by the debtor in response to acceleration might be deemed a prepayment within the ambit of that regulation. But so long as the creditor's rebate practice under acceleration is identical to its policy with respect to voluntary prepayments, *separate* disclosure of the acceleration policy does not seem obligatory under a literal reading of the regulation. Section 226.8 (b)(7), therefore, squares with the position of the Federal Reserve Board staff that specific disclosure of acceleration rebate policy is only necessary when that policy varies from the custom with respect to voluntary prepayment rebates. FRB Official Staff Interpretation No. FC–0054, 12 CFR Part 226 Appendix, p. 627 (1979).

## III

Notwithstanding the absence of an express statutory mandate that acceleration procedures be invariably disclosed, the

---

[7] Seven of the Courts of Appeals, including that for the Ninth Circuit, have refused to treat acceleration *simpliciter* as a "charge" within 15 U. S. C. § 1638 (a)(9) and 12 CFR § 226.8 (b)(4) (1979). *Johnson* v. *McCrackin-Sturman Ford, Inc.,* 527 F. 2d, at 265–268 (CA3); *McDaniel* v. *Fulton Nat. Bank,* 576 F. 2d, at 1157 (CA5) (en banc); *Croysdale* v. *Franklin Sav. Assn.,* 601 F. 2d 1340, 1342–1343, and n. 2 (CA7 1979); *Griffith* v. *Superior Ford,* 577 F. 2d, at 457–459 (CA8); *St. Germain* v. *Bank of Hawaii,* 573 F. 2d 572, 573–574 (CA9 1977); *United States ex rel. Hornell* v. *One 1976 Chevrolet,* 585 F. 2d, at 981 (CA10); *Price* v. *Franklin Investment Co.,* 187 U. S. App. D. C., at 393, 574 F. 2d, at 604.

Court of Appeals has held that the "creditor must [always] disclose whether a rebate of unearned interest will be made upon acceleration and also disclose the method by which the amount of unearned interest will be computed if the debt is accelerated." *St. Germain* v. *Bank of Hawaii*, 573 F. 2d, at 577; accord, 588 F. 2d, at 757–758. In so deciding, the Court of Appeals in *St. Germain* explicitly rejected the view of the Federal Reserve Board staff that the right of acceleration need *not* be disclosed, and that rebate practice under acceleration must be disclosed only if it differs from the creditor's rebate policy with respect to voluntary prepayment. FRB Official Staff Interpretation No. FC–0054, *supra;* see FRB Public Information Letter No. 851, [1974–1977 Transfer Binder] CCH Consumer Credit Guide ¶ 31,173; FRB Public Information Letter No. 1208, *id.,* ¶ 31,647; FRB Public Information Letter No. 1324, 5 CCH Consumer Credit Guide ¶ 31,827 (1979).[8] Rather, *St. Germain* declared that it would

---

[8] Official Staff Interpretation No. FC–0054 provides, in pertinent part: "It is staff's opinion that the phrase 'default, delinquency, or similar charges in the event of late payments,' found in § 128 (a) (9) and § 129 (a) (7) of the Truth in Lending Act and § 226.8 (b) (4) of Regulation Z, refers to specific sums assessed against a borrower solely because of failure to make payments when due. It is staff's opinion that the mere right to accelerate contained in a contractual provision which sets out the creditor's right to accelerate the entire obligation upon a certain event (generally the obligor's failure to make a payment when due) is not a *charge* payable in the event of late payment. Therefore, it need not be disclosed under § 226.8 (b) (4).

"Your [*sic*] refer to a prior Public Information Letter, No. 851, which discusses the right of acceleration. . . . Staff understands that letter to say that early payment of the balance of a precomputed finance charge obligation by a customer upon acceleration by the creditor is essentially the same as a prepayment of the obligation. Therefore, if the creditor does not rebate unearned finance charges in accordance with the rebate provisions disclosed under § 226.8 (b) (7) when the customer pays the balance of the obligation upon acceleration, any amounts retained beyond those which would have been rebated under the disclosed rebate provisions

"choose the direction that makes more sense to us in trying to achieve the congressional purpose of providing meaningful disclosure to the debtor about the costs of his borrowing." 573 F. 2d, at 576–577.

---

do represent the type of charge that must be disclosed under § 226.8 (b)(4)." (Emphasis added.)

Information Letter No. 851 states, in part:

"For the purposes of Truth in Lending disclosures, this staff views an acceleration of payments as essentially a prepayment of the contract obligation. As such, the disclosure provisions of § 226.8 (b)(7) . . . of the Regulation, which require the creditor to identify the method of rebating any unearned portion of the finance charge or to disclose that no rebate would be made, apply. If the creditor rebates under one method for acceleration and another for voluntary prepayment, both methods would need to be identified under § 226.8 (b)(7). . . .

"If, under the acceleration provision, a rebate is made by the creditor in accordance with the disclosure of the rebate provisions of § 226.8 (b)(7), we believe that there is no *additional* 'charge' for late payments made by the customer and therefore no need to disclose under the provisions of § 226.8 (b)(4). On the other hand, if upon acceleration of the unpaid remainder of the total of payments, the creditor does not rebate unearned finance charges in accordance with the rebate provisions disclosed in § 226.8 (b)(7), any amounts retained beyond those which would have been rebated under the disclosed rebate provisions represent a 'charge' which should be disclosed under § 226.8 (b)(4)."

Information Letter No. 1208 states, in part:

"In FC–0054, staff took the position that a creditor's right of acceleration upon default by the obligor need not be disclosed as a default, delinquency, or late payment charge within the context of § 226.8 (b)(4). The interpretation went on to state, however, that since early payment of the balance of an obligation upon acceleration is essentially the same as voluntary prepayment, if the creditor does not rebate unearned finance charges in the former situation in accordance with the rebate provisions disclosed under § 226.8 (b)(7), any extra amounts retained represent the type of charge that must be disclosed under § 226.8 (b)(4)."

Information Letter No. 1324 states, in part:

"The staff's position . . . is that if a creditor rebates unearned finance charges in connection with prepayment upon acceleration using the same method as for voluntary prepayment and that method has been properly

It is a commonplace that courts will further legislative goals by filling the interstitial silences within a statute or a regulation. Because legislators cannot foresee all eventualities, judges must decide unanticipated cases by extrapolating from related statutes or administrative provisions. But legislative silence is not always the result of a lack of prescience; it may instead betoken permission or, perhaps, considered abstention from regulation. In that event, judges are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme. Accordingly, caution must temper judicial creativity in the face of legislative or regulatory silence.

At the very least, that caution requires attentiveness to the views of the administrative entity appointed to apply and enforce a statute. And deference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z. Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive for several reasons.

---

disclosed in accordance with § 226.8 (b) (7), there is no default charge. However, any amounts retained by a creditor upon acceleration which would have been rebated under the disclosed rebate provisions would represent the type of default charge which must be disclosed pursuant to § 226.8 (b) (4)."

In *St. Germain,* the Court of Appeals spurned these administrative opinions as a source of interpretive guidance on the ground that the several letters were "conflicting signals." 573 F. 2d, at 576. As we read the Staff Opinion and Letters, however, they are fundamentally consistent, if somewhat inartfully drafted. The staff's position in each appears to be that separate disclosure of acceleration rebate practices is unnecessary when those practices parallel voluntary prepayment rebate policy. On the other hand, where acceleration rebates are less than voluntary prepayment rebates, acceleration policy must be separately explained under § 226.8 (b) (4) and, perhaps as well, under § 226.8 (b) (7). Neither the Opinion nor the Letters suggest that acceleration rebate policy must be separately disclosed in all instances.

The Court has often repeated the general proposition that considerable respect is due "'the interpretation given [a] statute by the officers or agency charged with its administration.'" *Zenith Radio Corp.* v. *United States,* 437 U. S. 443, 450 (1978), quoting *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965); see, *e. g., Power Reactor Co.* v. *Electricians,* 367 U. S. 396, 408 (1961). An agency's construction of its own regulations has been regarded as especially due that respect. See *Bowles* v. *Seminole Rock Co.,* 325 U. S. 410, 413–414 (1945). This traditional acquiescence in administrative expertise is particularly apt under TILA, because the Federal Reserve Board has played a pivotal role in "setting [the statutory] machinery in motion. . . ." *Norwegian Nitrogen Products Co.* v. *United States,* 288 U. S. 294, 315 (1933). As we emphasized in *Mourning* v. *Family Publications Service, Inc.,* 411 U. S. 356 (1973), Congress delegated broad administrative lawmaking power to the Federal Reserve Board when it framed TILA. The Act is best construed by those who gave it substance in promulgating regulations thereunder.[9]

Furthermore, Congress has specifically designated the Federal Reserve Board and staff as the primary source for interpretation and application of truth-in-lending law. Because creditors need sure guidance through the "highly technical" Truth in Lending Act, S. Rep. No. 93–278, p. 13 (1973), legislators have twice acted to promote reliance upon Federal Reserve pronouncements. In 1974, TILA was amended to

---

[9] To be sure, the administrative interpretations proffered in this case were issued by the Federal Reserve staff rather than the Board. But to the extent that deference to administrative views is bottomed on respect for agency expertise, it is unrealistic to draw a radical distinction between opinions issued under the imprimatur of the Board and those submitted as official staff memoranda. See FRB Public Information Letter No. 444, [1969–1974 Transfer Binder] CCH Consumer Credit Guide ¶ 30,640. At any rate, it is unnecessary to explore the Board/staff difference at length, because Congress has conferred special status upon official staff interpretations. See 15 U. S. C. § 1640 (f); 12 CFR § 226.1 (d) (1979).

provide creditors with a defense from liability based upon good-faith compliance with a "rule, regulation, or interpretation" of the Federal Reserve Board itself. § 406, 88 Stat. 1518, codified at 15 U. S. C. § 1640 (f). The explicit purpose of the amendment was to relieve the creditor of the burden of choosing "between the Board's construction of the Act and the creditor's own assessment of how a court may interpret the Act." S. Rep. No. 93–278, *supra,* at 13. The same rationale prompted a further change in the statute in 1976, authorizing a liability defense for "conformity with any interpretation or approval by an official or employee of the Federal Reserve System duly authorized by the Board to issue such interpretations or approvals. . . ." § 3 (b), 90 Stat. 197, codified at 15 U. S C. § 1640 (f); see 122 Cong. Rec. 2836 (1976) (remarks of Sen. Garn); *id.,* at 2852 (remarks of Rep. Annunzio, chairman of Consumer Affairs Subcommittee); *ibid.* (remarks of Rep. Rousselot); 121 Cong. Rec. 36927 (1975) (remarks of Rep. Annunzio); *id.,* at 36927–36928 (remarks of Rep. Wylie).[10]

The enactment and expansion of § 1640 (f) has significance beyond the express creation of a good-faith immunity.[11] That statutory provision signals an unmistakable congressional decision to treat administrative rulemaking and inter-

---

[10] Title 12 CFR § 226.1 (d) (1979) authorizes the issuance of official staff interpretations that trigger the application of § 1640 (f). Official interpretations are published in the Federal Register, and opportunity for public comment may be requested. 12 CFR § 226.1 (d). Unofficial interpretations have no special status under § 1640 (f).

[11] Although FMCC claims that its pre-1976 disclosure policy comported with Official Staff Interpretation No. FC–0054 (issued in 1977), it has not argued before this Court that it is entitled to the immunity afforded by the 1976 amendment to § 1640 (f). We need not decide, therefore, whether the 1976 amendment may be invoked with respect to contracts formed before its enactment or whether conformity with a subsequently issued official staff interpretation constitutes "compliance" within the terms of § 1640 (f).

pretation under TILA as authoritative. Moreover, language in the legislative history evinces a decided preference for resolving interpretive issues by uniform administrative decision, rather than piecemeal through litigation.[12] See S. Rep. No. 93–278, *supra,* at 13–14; 122 Cong. Rec. 2852 (1976) (remarks of Rep. Annunzio); 121 Cong. Rec. 36927 (1975) (remarks of Rep. Annunzio). Courts should honor that congressional choice. Thus, while not abdicating their ultimate judicial responsibility to determine the law, cf. generally *SEC* v. *Chenery Corp.,* 318 U. S. 80, 92–94 (1943), judges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve, so long as the latter's lawmaking is not irrational.

Finally, wholly apart from jurisprudential considerations or congressional intent, deference to the Federal Reserve is compelled by necessity; a court that tries to chart a true course to the Act's purpose embarks upon a voyage without a compass when it disregards the agency's views. The concept of "meaningful disclosure" that animates TILA, see *St. Germain,* 573 F. 2d, at 577, cannot be applied in the abstract. *Meaningful* disclosure does not mean *more* disclosure. Rather, it describes a balance between "competing considerations of complete disclosure . . . and the need to avoid . . . [informational overload]." S. Rep 96–73, p. 3 (1979) (accompanying S. 108, Truth in Lending Simplification and Reform Act); see S. Rep. No. 95–720, pp. 2–3 (1978); 63 Federal Reserve Board Ann. Rep. 326, 349–350 (1976); Comment, Acceleration Clause Disclosure Under the Truth in Lending Act, 77 Colum. L. Rev. 649, 662–663 (1977). And striking the appropriate balance is an empirical process that entails investigation into consumer psychology and that presupposes

---

[12] That preference is understandable. As the divergence of judicial views on the acceleration disclosure issue illustrates, see n. 6, *supra,* litigation is not always the optimal process by means of which to formulate a coherent and predictable body of technical rules.

broad experience with credit practices. Administrative agencies are simply better suited than courts to engage in such a process.

The Federal Reserve Board staff treatment of acceleration disclosure rationally accommodates the conflicting demands for completeness and for simplicity. In determining that acceleration rebate practices need be disclosed only when they diverge from other prepayment rebate practices, the Federal Reserve has adopted what may be termed a "bottom-line" approach: that the most important information in a credit purchase is that which explains differing net charges and rates. Cf. S. Rep. No. 96–73, *supra,* at 3–4; 63 Federal Reserve Board Ann. Rep., *supra,* at 350–352. Although the staff might have decided that acceleration rebates are so analytically distinct from identical voluntary prepayment rebates as to warrant separate disclosure, it was reasonable to conclude, alternatively, that ordinary consumers would be concerned chiefly about differing financial consequences.[13]

---

[13] The Federal Reserve might reasonably have adopted the disclosure approach of the Court of Appeals for the Fifth Circuit, focusing upon a creditor's contractual acceleration rebate *rights,* rather than upon the creditor's operating rebate *policy.* See *McDaniel* v. *Fulton Nat. Bank,* 576 F. 2d, at 1157. But, again, it was equally logical to conclude that so long as the creditor's actual practice upon acceleration was the same as its practice upon prepayment, it was not necessary to require disclosure of the creditor's unexercised rights in the disclosure statement itself.

In arguing for affirmance, respondents contend that disclosure of a creditor's rebate policy at the time of credit contract formation is no guarantee against a change in that policy at some future date, perhaps after the TILA statute of limitations has run. See 15 U. S. C. § 1640 (e). But when a genuine change in policy occurs after disclosure, the statute itself may arguably contemplate that the creditor be immune from liability. See 15 U. S. C. § 1634; S. Rep. No. 392, 90th Cong., 1st Sess., 18 (1967). On the other hand, if the creditor envisioned a change in policy at the time it disclosed practices contemporaneously in force, then the debtor might conceivably have a claim for fraud. In any event, it is open to the Federal Reserve to consider this question when reviewing its position on acceleration rebate disclosure.

Faced with an apparent lacuna in the express prescriptions of TILA and Regulation Z, the Court of Appeals had no ground for displacing the Federal Reserve staff's expert judgment.

Accordingly, we decide that the Court of Appeals erred in rejecting the views of the Federal Reserve Board and staff, and holding that separate disclosure of acceleration rebate practices is always required.[14]

*Reversed and remanded.*

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE joins, concurring.

I join the Court's opinion but write separately because I do not fully agree with the statement in note 13 of the opinion, *ante,* at 569, that the Federal Reserve Board's approach to the disclosure of acceleration rebates is "equally logical" with other alternatives it might have chosen. In particular, I am concerned that the Board's emphasis on a creditor's rebate *policy* rather than its contract *rights* steers the Truth in Lending Act away from the moorings of contract law in a manner that may not prove salutary for the welfare of consumers of financial credit.

To be sure, consumers contemplating installment purchases are concerned with the "bottom line," *ante,* at 569, of how much they will be required to pay. But there is little doubt, in my view, that consumers who read the required disclosures

---

[14] Respondents argue before this Court that even under the Federal Reserve staff's view, petitioners violated TILA and Regulation Z because the credit contract itself contained language concerning acceleration rebates that assertedly contradicted the disclosures on the face of the contract. That contradiction, if present, could run afoul of 12 CFR § 226.8 (b)(7) or § 226.6 (c) (1979), as those provisions are understood by the agency staff. See FRB Public Information Letter No. 1324, *supra* n. 8. But respondents prevailed in the District Court and in the Court of Appeals upon broader rulings that acceleration clause disclosure was generally required; neither court addressed the specific allegation of contradiction. Therefore, if properly presented, the contradiction issue is open for decision on remand.

think that they are reading a description of their legal rights and obligations, and not merely an explanation of "practices" or "policies" of the creditor that may be changed to their detriment at the creditor's will. Although there may be reason to believe that a major finance company, such as Ford Motor Credit Co., will adhere to its rebate practices despite the legal right to demand more upon acceleration than it said it would, I am not sanguine that a less responsible organization always will do the same. The result could be confusion and unanticipated financial loss, as well as fruitless litigation.

Ultimately, I think the interpretation adopted by the Fifth Circuit in *McDaniel* v. *Fulton Nat. Bank,* 571 F. 2d 948 (en banc), clarified, 576 F. 2d 1156 (1978) (en banc), which requires disclosure of the creditor's right to retain finance charges upon acceleration when it differs from the right to such charges upon prepayment, may prove to be a sounder and more durable application of the statute than the position currently adopted by the Board. Nevertheless, I agree with the Court that the Board's approach is reasonable. In order to uphold the Board's position, "we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Udall* v. *Tallman,* 380 U. S. 1, 16 (1965), quoting *Unemployment Comm'n* v. *Aragon,* 329 U. S. 143, 153 (1946). Accordingly, I agree that the courts should not add to the disclosure obligations that the Board has outlined through its staff opinions.