PENSION BENEFIT GUARANTY
CORPORATION, Plaintiff,

v.

J.D. INDUSTRIES, INC.; TFI, Inc.
General Boat, Inc.; and Wittek
Industries, Inc., Defendants.

No. 1:92–CV–859.

United States District Court,
W.D. Michigan,
Southern Division.

Oct. 25, 1994.

Agnes M. Kempker–Cloyd, U.S. Asst. Atty., Michael H. Dettmer, U.S. Atty., Grand Rapids, MI, Bruce H. James, Pension Ben. Guar. Corp., Office of Gen. Counsel, Washington, DC, for Pension Ben. Guar. Corp.

Robert J. Dugan, Rhoades, McKee, Boer, Goodrich, et al., Grand Rapids, MI, Stephen A. Rothschild, Shumaker, Loop & Kendrick, Toledo, OH, for J.D. Industries, Inc., TFI, Inc., General Boat, Inc., and Wittek Industries, Inc.

## OPINION

ROBERT HOLMES BELL, District Judge.

In this case, the Pension Benefit Guaranty Corporation (PBGC) seeks to recover a principal amount of $408,198.00 plus interest pursuant to 29 U.S.C. §§ 1362 and 1368 as a result of an unfunded pension plan (Plan) of Century Boat, Inc. (Century), which corporation PBGC alleges was "under common control" of Defendants. Before the Court at this time is PBGC's motion for partial summary judgment.[1] For the reasons that follow, the Court will grant PBGC's motion.

### I

ERISA imposes joint and several liability upon the contributing sponsor of a single-employer pension and upon each member of such a contributing sponsor's controlled group if, upon the termination of the plan, the plan assets are insufficient to fund the benefits guaranteed by PBGC under Title IV of ERISA. 29 U.S.C. § 1362(a) (Supp.1986).[2] The amount of the liability

shall consist of the sum of—

---

1. PBGC is seeking summary judgment only with respect to J.D. Industries, Inc.; TFI, Inc.; and General Boat. The clerk of this Court filed an Entry of Default against Wittek Industries, Inc. on June 2, 1994.

2. The provisions of ERISA applicable to this motion are those which existed when PBGC initiated termination of the Plan in November 1987. Pub.L. No. 99–272, Title XI, § 11019(a)(2), 100 Stat. 280 (1986). Compare with Pub.L. No. 100–203, Title IX, § 9312(d), 101 Stat. 1330–364 (1987). Citations to ERISA and the U.S. Code in this opinion are to the 1986 law unless otherwise noted.

(i) the lesser of—

(I) the total amount of unfunded guaranteed benefits (as of the termination date) of all participants and beneficiaries under the plan, or

(II) 30 percent of the collective net worth of all persons described in subsection (a) of this section,

\*    \*    \*    \*    \*    \*

29 U.S.C. § 1362(b)(1)(A) (Supp.1986).

For the purpose of § 1362, the term "controlled group" means a group consisting of the contributing sponsor of the plan and "all other persons under common control with such person." 29 U.S.C. § 1301(a)(14)(A) (Supp.1986).

[T]he determination of whether two or more persons are under "common control" shall be made under regulations of the [PBGC] which are consistent and coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury under subsections (b) and (c) of section 414 of title 26.

29 U.S.C. § 1301(a)(14)(B) (Supp.1986).

Treasury regulations under Internal Revenue Code section 414(c), 26 U.S.C. § 414(c), provide that a parent-subsidiary controlled group exists if:

(i) A controlling interest in each of the organizations, except the common parent organization, is owned (directly and with the application of § 1.414(c)–4(b)(1), relating to options) by one or more of the other organizations; and

(ii) The common parent organization owns (directly and with the application of § 1.414(c)–4(b)(1), relating to options) a controlling interest in at least one of the other organizations....

Treas.Reg. § 1.414(c)–2(b)(1). The term "controlling interest" means "at least 80 percent of total combined voting power ... or at least 80 percent of the total value" of the corporation. Treas.Reg. § 1.414(c)–2(b)(2); *see also PBGC v. East Dayton Tool & Die Co.,* [14 F.3d 1122, 1126–27 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994) ]. Certain categories of stock are excluded when computing whether a controlling interest exists. Relevant to the instant case, Treas.Reg. § 1.414(c)–3(a) provides in part that "the term 'stock' does not include treasury stock." Also, "[a]n interest which is an interest in or stock of the subsidiary organization held by a trust which is part of a plan of deferred compensation ... for the benefit of the employees of the parent organization or the subsidiary organization shall be excluded." Treas.Reg. § 1.414(c)–3(b)(3).

## II

The relevant facts of the instant case are not in dispute and are set forth in the decision of the PBGC's Appeals Board from which the Court takes the following statement of facts.

During 1985 and 1986, J.D. Industries was a holding company for several wholly owned subsidiary companies, including [TFI, Wittek Industries (Wittek), and General Boat, Inc. (General) ]. On or about December 31, 1985, General Boat acquired 157,087 shares of Century common stock. At the time of this acquisition, Century had 242,221 common shares outstanding. The acquisition resulted in [General] becoming the majority and controlling shareholder of Century. In addition to the shares acquired by [General], 39,037 shares were held by the Century Boat Company Employee Stock Ownership Plan ("ESOP"), and 24,890 shares of treasury stock were pledged to Chase Manhattan Capital Corporation ("Chase").

During early 1986, it was discovered that the purchase of Century shares by [General] created a default under certain agreements between Century and Chase, giving Chase the right to vote and sell the pledged shares. During March 1986, Century purchased 10,844 if other outstanding shares from minority shareholders on the same terms and conditions of the [General] purchase. After this acquisition and as of December 15, 1986 (the date of plan termination), share ownership of Century was as follows:

| Shareholders | Number of Shares | Percentage |
| --- | --- | --- |
| General Boat | 157,087 | 64.85 |
| Century ESOP | 39,037 | 16.12 |
| Chase | 24,890 | 10.27 |
| Treasury | 10,844 | 4.48 |
| Others (non-Treasury) | 10,363 | 4.28 |
| | 242,221 | 100.00 |

At the time of the General Boat acquisition of Century stock in December 1985, Century was a financially troubled company that was experiencing significant losses. Century continued to lose money during 1986. In July 1986, Century's Manistee, Michigan plant was closed. On November 28, 1986, Century ceased all business operations. On December 3, 1986, the Michigan National Bank, a secured creditor, sold substantially all of Century's remaining assets. On December 15, 1986, an involuntary Chapter 7 petition was filed against Century by other of its creditors.

Century was the contributing sponsor of a single employer defined benefit pension plan, known as the Retirement Income Plan for Employees of Century Boat Company. The Plan was established on or about April 1, 1973, and was amended and restated on several occasions after that time. As of December 1986, the Plan was a qualified plan insured by the PBGC pursuant to Title IV of ERISA. During 1987, the PBGC determined that the Plan had been abandoned and was underfunded, with participants out of pay status. On November 2, 1987, the PBGC issued a Notice of Determination pursuant to 29 U.S.C. § 1342 that the Plan should be terminated and that the PBGC should be appointed statutory trustee of the Plan. By agreement with the Chapter 7 Trustee for Century dated November 30, 1987, the PBGC became trustee of the Plan pursuant to Section 4042(c) of ERISA, 29 U.S.C. § 1342(c). The date of plan termination was determined to be December 15, 1986, the date of the filing of the Chapter 7 petition.

The PBGC conducted a controlled group audit to determine whether there was a basis to seek recovery under ERISA's employer liability provisions for underfunding of the Plan. Section 4062 of ERISA, 29 U.S.C. § 1362. By letter dated March 13, 1987 and thereafter, J.D. Industries (acting for both itself and its subsidiaries), and its certified public accountants supplied the PBGC with various financial and other records pursuant to information requests relating to the PBGC's audit. By September 1987, the audit concluded that J.D. Indus-

tries and its subsidiaries, including Century Boat, were trades or businesses under common control as of December 15, 1986.

The controlled group audit was followed by a net worth valuation of the controlled group members, so that a further determination could be reached as to the limits of any employer liability claim in view of the law then in effect. Section 4062(b) of ERISA, 29 U.S.C. § 1362(b) (1982 and Supp. IV 1986). By memorandum dated July 11, 1990, the PBGC staff concluded preliminarily that the minimum net worth of the controlled group was not less than $3 million.

Wittek appears to have been acquired from J.D. Industries by [Ms. Carmen] Viana in December 1990. By letters dated June 25, 1992, the PBGC advised J.D. Industries and its subsidiaries and Wittek of its initial determinations of the existence of controlled group liability and of the determination of the controlled group's collective net worth as of December 15, 1986, and requested payment of the principal amount of liability, plus statutory interest. R. at 3–5.

Defendants appealed these initial determinations to the PBGC Appeals Board which upheld the agency's initial determinations. Specifically, in its application of the 80% control test, the Appeals Board determined that the controlled group audit correctly excluded the treasury shares and the ESOP shares. With regard to the exclusion of these shares, Defendants assert, and the PBGC does not dispute, that Century was insolvent at the time it repurchased the treasury shares. Also, in July 1986, Century shut down its Manistee, Michigan facility and terminated the employment of its employees at that location. Pursuant to the terms of the ESOP, that termination vested an undetermined number of the ESOP share in those employees. However, as of December 15, 1986, these shares remained in the ESOP. On motions for reconsideration, the findings and conclusions of the PBGC Appeals Board were upheld. The PBGC subsequently brought the instant action to enforce its determinations. *See* 29 U.S.C. § 1303(e) (Supp. 1986).

## III

While there is a lack of authority directly indicating that an enforcement action brought by an agency is subject to judicial review under the Administrative Procedure Act (APA), the Court concludes that this is the proper source of the standard of review. *Cf. PBGC v. LTV Corp.*, 496 U.S. 633, 647, 110 S.Ct. 2668, 2676, 110 L.Ed.2d 579 (1990) (applying the APA's arbitrary and capricious standard of review to the PBGC's action to enforce its restoration of plans decision). Accordingly, looking solely to the administrative record, *see Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973), the Court must determine whether the PBGC's determinations are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The Court's review of the PBGC's determinations in the instant case requires the Court to decide three questions: (1) whether the PBGC properly chose to apply the "80% control test" to determine the controlled-group status of Century; (2) whether the PBGC properly applied the "80% control test"; and (3) whether the PBGC properly determined Defendants' values.

### A

In their response to PBGC's motion for summary judgment, Defendants argue that the PBGC improperly chose to apply the brightline "80% control test" to determine whether Century was a part of the JDI controlled group. Relying upon *In re Challenge Stamping & Porcelain Co.*, 719 F.2d 146 (6th Cir.1983), Defendants argue that a strict application of the 80% control test in the instant case runs afoul of the purposes behind 29 U.S.C. § 1362. In *Challenge Stamping*, Challenge Stamping purchased all of the stock of Puffer–Hubbard while Puffer–Hubbard was in bankruptcy. Nevertheless, the court held: "The purpose of the 80% regulation is obviously to find the party in *control*. When, by operation of bankruptcy law, a party is actually denied control, there is no reason to apply the regulation." *Challenge Stamping*, 719 F.2d at 151.

The factual situation in the instant case is far removed from that in *Challenge Stamping*. Clearly, even assuming that General did not have eighty percent or more control of Century, it certainly did have actual control of Century. This is readily apparent by Defendants' own acknowledgement that General held nearly sixty-five percent of the Century stock. Accordingly, there is no basis, either in law or equity, for not applying the 80% control test in the instant case.

### B

Next, the Court considers whether the PBGC correctly applied the 80% control test. Specifically, Defendants point to two decisions by the PBGC which they argue are contrary to law. The first involves the PBGC's conclusion that, in applying the 80% control test, the 10,844 treasury shares should not be considered pursuant to Treas. Reg. 1.414(c)–3(a). Under a law which was applicable at the time of Century's repurchase of these shares, it was unlawful for a corporation to repurchase shares while insolvent. MICH.COMP.LAWS § 450.1365(2). Since, at the time Century repurchased these shares, Century was insolvent, Defendants contend that the PBGC improperly excluded these shares in its application of the 80% control test. The Court rejects Defendants' argument. Defendants' argument could only possibly succeed if Century's repurchase of these shares was void *ab initio*; but the Court finds no reason to reach such a conclusion. Rather, looking to the purpose behind the controlled-group analysis, the Court concludes that, regardless of the illegality of the repurchase, the repurchase nevertheless increased General's effective control over Century in that, until a party aggrieved by the illegal repurchase successfully challenged the repurchase, no one had the right to vote the repurchased shares.

Defendants also argue that the PBGC's exclusion of the ESOP shares for the purpose of the 80% control test calculation was contrary to law. The legal question in this regard is whether the PBGC improperly excluded at least some of the ESOP shares which were vested in Century's terminated Manistee employees on December 15, 1986.

The PBGC literally applied Treas.Reg. § 1.414(c)–3(b)(3) and determined that the phrase "stock ... held by a trust" means just that regardless of whether that stock is vested or unvested. Noting that the Supreme Court has repeatedly indicated that "[a]n agency's construction of its own regulations has been regarded as especially due that [considerable respect due]," *see, e.g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980), this Court concludes that the PBGC's construction of this regulation is a permissible construction. *Cf. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); *see also Concord Control, Inc. v. UAW,* 647 F.2d 701, 704 (6th Cir.), *cert. denied,* 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981) (holding that "the determination of the PBGC is entitled to great deference in the construction and application of ERISA").

Even without the Court's giving due deference to the PBGC's interpretation of the phrase "stock ... held in trust," the Court further concludes that it would reach the same conclusion as the PBGC did. There is no reason not to interpret the regulation literally in the instant case. Also, so long as the shares of stock were held by the ESOP, even though some shares had vested, General's control of Century was not diluted.

### C

■ Finally, the Court considers whether the PBGC correctly determined Defendants' values. The method of the PBGC's determining of the value of the controlled group is set forth in 29 U.S.C. § 1362(e)(1)(B) (Supp. 1986):

[T]he net worth of a person is—

(i) determined on whatever basis best reflects, in the determination of the corporation, the current status of the person's operations and prospects at the time chosen for determining the net worth of the person....

Since this statute accords significant discretion to the PBGC in its determining of value, the Court reviews the PBGC's valuation for an abuse of discretion.

Pursuant to § 1362(e)(1)(B), the PBGC has established regulations for the determination of net worth:

An employer's net worth is equal to its fair market value and its fair market value shall be determined on the basis of the factors set forth below, to the extent relevant; different factors may be considered with respect to different portions of the employer's operations.

(1) A bona fide sale of, agreement to sell, or offer to purchase or sell the business of the employer made on or about the net worth record date;

\*     \*     \*     \*     \*     \*

(4) The price/earnings ratios and prices of stocks of similar trades or businesses on or about the net worth record date.

(5) The employer's economic outlook, as reflected by its earnings and dividend projections, current financial condition, and business history.

\*     \*     \*     \*     \*     \*

(9) Any other factor relevant in determining the employer's net worth.

29 C.F.R. § 2622.4 (1981). A PBGC memorandum dated July 11, 1990 sets forth the manner in which the PBGC valued the TFI.[3] *See* R. at 236–41. The valuation looked first to the price at which JDI acquired TFI in October 1984—approximately $5,900,000. The valuation also compared TFI to two corporations which the PBGC determined to be similar to TFI. On the low end, the PBGC determined TFI's comparative market price to be $10,000,000; the book value per share method yielded a comparative average value of $2,500,000. Finally, the valuation considered recent dividend yields which were capitalized to reach a value of $3,000,000. As a conclusion, the memorandum determined

---

**3.** To date, the PBGC has valued only TFI. Since TFI alone is worth more than $3,000,000, according to the PBGC, 30% of which is far in excess of the amount of the pension underfunding, the PBGC did not determine the value of the remaining members of the controlled group. The Court finds no abuse of discretion in this decision of the PBGC.

that the value of TFI alone was between three and ten million dollars.

On the other hand, Defendants argue that the PBGC should have relied on the 1990/1991 sale of TFI's assets to determine its value. The PBGC rejected the elevated relevance of this information, however, because the sales were not in near proximity to the net worth record date. Examining the record in light of the criteria set forth in the regulations, the Court concludes that the PBGC has not abused its discretion in either deciding which factors to rely upon most heavily or in the determination that TFI's net worth alone was at least $3,000,000.

IV

An order consistent with this opinion will be entered.

### JUDGMENT

In accordance with the opinion entered this date,

**IT IS HEREBY ORDERED AND ADJUDGED** that Plaintiff's motion for partial summary judgment (docket # 28) is **GRANTED.**

**IT IS FURTHER ORDERED** that **JUDGMENT** be entered in favor of Plaintiff against J.D. Industries, Inc.; TFI, Inc.; and General Boat, Inc. in the amount of $661,970.50 plus interest accruing after July 31, 1994 pursuant to 29 C.F.R. § 2622.7.