Patricia IRBY–GREENE, Plaintiff,

v.

M.O.R., INC., t/a Auto Maxx, et al., Defendants.

No. 99–1501–A.

United States District Court, E.D. Virginia, Alexandria Division.

Jan. 5, 2000.

Christopher Dikran Koomey, Alexandria, VA, for plaintiff.

David Reza Mahdavi, Fracassi Mahdavi, L.L.P., Falls Church, VA, for defendant M.O.R., Inc.

Michael McGettigan, Richards, McGettigan, Reilly & West, P.C., Alexandria, VA, Eugene J. Kelley, Jr., John L. Ropiequet, Christopher S. Naveja, Amstein & Lehr, Chicago, IL, for defendant Credit Acceptance Corp.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this dispute, a disgruntled purchaser of a used car has sued the seller of the car, and the assignee of the installment sales contract for the car. The assignee's threshold dismissal motion presents the following questions:

(1) Is the amount of the discount involved in the assignment of the contract a hidden finance charge in violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., for which the assignee may be liable?

(2) Is the assignee of a contract liable for the seller's misrepresentation of the car's mileage, in violation of the Odometer Act, 49 U.S.C. § 32705?

I

Plaintiff Patricia Irby–Greene purchased a used automobile on credit from defendant M.O.R., Inc., t/a Auto Maxx ("Auto Maxx") on April 23, 1999. In this regard, plaintiff signed an installment sales contract which established the credit terms and provided for assignment of the contract to defendant Credit Acceptance Corporation ("CAC"). According to the contract, the "cash price" for the car was $4,500.00, but the final purchase price included mechanical repair insurance, taxes, and other fees, bringing the total cash price to $5,954.75. Plaintiff made a $1125.00 down payment and Auto Maxx financed the remaining $4,829.75 for two years at an annual percentage rate of 22%. Under this arrangement, plaintiff was obligated to pay a total of $6,013.20 in twenty-four equal monthly installments of $250.55. Thus, the total sale price of the car, including the down payment, taxes, fees, warranty, and interest was $7,138.20 ($6,013.20 in principal and interest and $1125.00 in down payment).[1] Auto Maxx assigned the contract to CAC at an undisclosed discount from its face value.[2]

---

1. This figure does not account for inflation or the time value of money.

2. Retail installment contracts are regularly assigned to assignees at a discount, especially when the buyer "represents an increased credit risk." *See* Thomas B. Hudson et al., *Indirect Auto Finance Dealer Compensation Litigation,* 54 Bus.Law. 1301, 1307 (1999); *see also Jennings v. Edwards,* 454 F.Supp.

Plaintiff now contends that the amount by which the contract was discounted on assignment was a finance charge, and that both Auto Maxx and CAC are liable under TILA for Auto Maxx's failure to treat the discount as such. Plaintiff also contends that Auto Maxx intentionally understated the car's actual mileage by nearly 40,000 miles, in violation of the Odometer Act. Specifically, plaintiff alleges that the mileage was represented as being 73,297 miles, but that Auto Maxx had documents indicating the car's actual mileage was in excess of 113,000 miles. In its motion to dismiss, CAC argues that limits on assignee liability in this context bar both claims brought against it.

## II

To state a claim for assignee liability pursuant to TILA based on the creditor's[3] practice of assigning installment contracts at an undisclosed discount, plaintiff must allege (i) that the amount of the discount was a finance charge, and (ii) that the failure to disclose the discount as a finance charge was "apparent on the face of the disclosure statement." *See* 15 U.S.C. § 1641(a). With respect to the first question, Regulation Z, TILA's implementing regulation, teaches that a finance charge is any "charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4.[4] And, as TILA and the Regulation make clear, all

finance charges must be disclosed as such, and a creditor may not include a finance charge as an element of the "amount financed." *See* 15 U.S.C. § 1605 (defining "finance charge"); 12 C.F.R. § 226.18 (requiring disclosure and itemization of, *inter alia,* the finance charge and the amount financed). The purpose of the TILA disclosure requirement is to ensure that the consumer receives "a meaningful disclosure of credit terms," and is thus able to "compare more readily the various credit terms available to him" as well as to "avoid the uninformed use of credit." 15 U.S.C. § 1601(a). In short, the finance charge must represent and disclose to the consumer the actual cost of obtaining credit. *See Walker v. Wallace Auto Sales, Inc.,* 155 F.3d 927, 932 (7th Cir.1998) ("[A] creditor-merchant must disclose to a consumer buying on credit exactly how much he will pay for that credit.").

At first blush, the amount by which a contract is discounted on assignment does not appear to be a finance charge, as it is a cost imposed by the assignee on the creditor, and not by the creditor on the buyer. Indeed, the Official Staff Commentary to Regulation Z[5] confirms that if the discount is "absorbed as a cost of doing business," the cost of the discount is not a finance charge even if "the creditor may take such cost[ ] into consideration" in setting the cash price. Official Staff Commentary, 12 C.F.R. Pt. 226, Supp. I at 308.[6] Yet, this conclusion assumes there is a single price for cash and credit customers, and that

---

770, 777 (M.D.N.C.1978) (referring to the "normal transaction of selling commercial paper for less than its face value").

3. The parties do not dispute that Auto Maxx is the "creditor" and CAC is the "assignee" as those terms are used in TILA. *See* 15 U.S.C. § 1601(f) (defining "creditor"); 15 U.S.C. § 1641 (limiting assignee liability).

4. TILA grants the Board of Governors of the Federal Reserve System authority to "prescribe regulations to carry out the purposes of [TILA]." 15 U.S.C. § 1604(a). And, "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chev-*

*ron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

5. The Official Staff Commentary to Regulation Z should be dispositive "unless [it is] demonstrably irrational." *See Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980)

6. *See also Jennings,* 454 F.Supp. at 777 (holding that a discount need not be disclosed as a finance charge, because such a requirement "would unjustifiably impair the normal transaction of selling commercial paper for less than its face value").

this single price accounts for the reality of discounting, just as it would account for overhead and other costs of doing business. Thus, the Staff Commentary sensibly acknowledges that if the cost of the discount is "separately imposed" by the seller on a credit purchaser as a cost of that purchaser's obtaining credit, then the amount of the discount would, in fact, be a finance charge.[7] *Id.* Although the meaning of the phrase "separately imposed" has been subject to varying interpretations,[8] it seems quite clear, in light of TILA's purpose,[9] that the cost of the discount is "separately imposed" on a credit customer if the seller, to cover the cost of the discount, would have charged a credit customer a higher price than the price charged to a cash customer.[10] Indeed, were the seller to increase the price to cover the cost of the discount, he would simply be "burying the cost of credit in the price of the goods sold." *Id.* at 930 (citing *Mourning v. Family Publications Serv., Inc.*, 411 U.S. 356, 364, 93 S.Ct. 1652, 36 L.Ed.2d 318

(1973)). In sum, to state a TILA claim against CAC (or Auto Maxx) based on the practice of assigning commercial paper at a discount, plaintiff must allege that Auto Maxx charged plaintiff a higher price than it would charge a cash customer to account for the discount of the contract on assignment to CAC.[11]

In any event, whether the complaint in this case can be said to contain such an allegation need not be reached, for there is a further requirement for assignee liability under TILA that plaintiff cannot meet, namely, evidence that the violation is "apparent on the face of the disclosure statement." 15 U.S.C. § 1641(a). An assignee's sole duty under TILA is to examine the assigned documents for any irregularities or illegalities, even if the assignee has knowledge that a creditor's contracting practices may otherwise violate TILA. *See Taylor v. Quality Hyundai, Inc.*, 150 F.3d 689, 694 (7th Cir.1998).[12] Thus, in considering a claim of assignee liability, the relevant inquiry is whether "a reasonable per-

7. For example, assume that a seller seeks a profit of $1,000 on an automobile for which it paid $4,000. If the transaction is otherwise without cost, the seller would charge $5,000 to earn the desired profit. Next, assume that the seller extends a customer credit in the amount of $5,000, and sets the terms of credit to account for risk, opportunity cost, and other factors such that the promise to pay, taking risk into account, has a present value of $5,000. Thus, were the seller to assign the contract at a 20% discount, the seller would not achieve the profit on the transaction it seeks, because the contract, with a $5,000 value to the creditor, would be assigned for $4,000. To cover this cost, the seller might adjust the price of a car for a particular credit customer based on the expected discount to be imposed on that customer's contract. Thus, in the example above, a seller who wanted to assign the contract at a price which would preserve the $1,000 profit might cover the discount by increasing the "cash price" for that particular transaction to $6,250, which, when discounted by 20%, is $5,000. In this circumstance, it is readily apparent that the amount by which the price was increased to cover the discount is a "finance charge" as defined by TILA, as it is separately imposed as a "charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to

or a condition of the extension of credit." 12 C.F.R. § 226.4(a).

8. *Compare Sampson v. Mercury Finance Co.,* 1996 WL 1057530 (M.D.Ala. Feb.14, 1996) (holding that the cost of a discount is not separately imposed if it is included in the purchase price), *with Walker v. Wallace Auto Sales, Inc.,* 155 F.3d 927, 932 (7th Cir.1998) (holding that the cost of a discount is separately imposed if the cost is imposed on those who buy on credit but not on those who pay cash).

9. *See supra* text accompanying note 4.

10. *See Walker,* 155 F.3d at 932 (concluding that the practice of charging credit customers higher prices to cover the discount on assignment imposes an undisclosed finance charge).

11. Thus, strictly speaking, the finance charge would be the amount by which the price of the car was increased to cover the expected cost of the discount, and not the amount by which the contract was actually discounted.

12. *See also Green v. Levis Motors, Inc.,* 179 F.3d 286, 295 (5th Cir.1999) (holding that an assignee has no duty to inquire beyond the face of the assigned documents); *Ellis v. Gen-*

son can spot [any violations] on the face of the disclosure statement or other assigned documents." *Taylor*, 150 F.3d at 694. In other words, even assuming CAC's awareness of Auto Maxx's discounting practice, CAC cannot be held liable under TILA unless the contract itself reflects that the cash price was increased to cover the cost of the discount. *See* 15 U.S.C. § 1641(a). In that regard, plaintiff suggests that the failure to treat the amount of the discount as a finance charge is apparent on the face of the disclosure statement, as the contract itself discloses the fact that the contract may be assigned at a discount, but does not include the discount as a finance charge. Yet, the amount of the discount would be a finance charge only if Auto Maxx actually increased the price of the car sold to plaintiff to cover the cost of the expected discount. And significantly, even assuming that Auto Maxx increased the price of plaintiff's car to cover the discount, the contract does not reflect that fact.[13] Indeed, the opposite is true, as the contract states that Auto Maxx "did not increase the price of the vehicle because [plaintiff] was purchasing the vehicle on credit or because this Contract would be assigned." With this clause, the disclosure statement, on its face, is unambiguous: A reasonable person considering the contract would conclude that the "cash price" was not increased to cover the cost of any discount. Thus, even assuming plaintiff has stated a claim for relief against Auto Maxx, a question not reached here, it has not stated a claim against CAC. Accordingly, Count II of the complaint against CAC must be dismissed.

## III

 The second question is whether CAC may be held liable for Auto Maxx's alleged violation of the Odometer Act, 49 U.S.C. § 32705. The Odometer Act provides a transferee of a vehicle with a remedy if the transferor intentionally misrepresents that vehicle's mileage. *See Diersen v. Chicago Car Exchange*, 110 F.3d 481, 488 (7th Cir.1997). But the Act does not establish assignee liability for the transferor's misrepresentation; indeed, it is well-established that the cause of action created by the Odometer Act exists only against a transferor.[14] *See Ryan v. Edwards*, 592 F.2d 756, 762 (4th Cir.1979).

 Thus, the issue is whether CAC, which is not a "transferor" within the

eral Motors Acceptance Corp., *160 F.3d 703, 709 (11th Cir.1998) (holding that a plaintiff may not "resort to evidence or documents extraneous to the disclosure statement" to determine assignee liability under TILA);* Walker, *155 F.3d at 936 ("[E]ven if the ... amended complaint could be construed to allege that [the assignee] had actual knowledge of [the seller's] practice of disguising finance charges, such allegations are not sufficient, under the plain wording of the statute, to state a TILA claim for assignee liability against [the assignee].").*

This limit on assignee liability is sensible, as a duty to inquire beyond the assigned documents would impede commerce, which depends upon the established practice of assigning commercial paper at a discount to financial institutions. In general, assignees are not in a position to know whether a given price was set in violation of TILA, as assignees often are not present at the transaction (which may have occurred much earlier than the assignment), do not participate in the negotiation, and may not be aware of a seller's mode of conducting business. Assignees are in a position to examine the doc-

uments assigned for irregularities, and they usually make pricing decisions based on those documents. Thus, 15 U.S.C. § 1641(a) "enable[s] an assignee to know with [a reasonable degree of] certainty upon receipt of assigned documents whether it would be subject to possible liability for the actions of the vendor." Hatch, Diab, & Lankarani, *Taylor v. Quality Hyundai, Inc.: Assignee Liability under Section 1641(a) of the Truth in Lending Act*, 52 Consumer Fin.L.Q.Rep. 354, 357 (1998).

13. This case would be different had the contract included a worksheet in which the "cash price" was increased by some percentage to account for the discount, and the amount of the increase was not included among the other finance charges. In that event, it would be clear from the face of the documents that the amount of the increase was a cost of obtaining credit, and thus, a finance charge.

14. The term "transferor" is defined by the Department of Transportation as "any person who transfers his ownership of a motor vehi-

meaning of the Odometer Act,[15] is nonetheless liable for transferor-Auto Maxx's alleged violation of the Act. In that regard, the installment contract contains a clause which must appear in all consumer installment contracts pursuant to the so-called "FTC Holder Rule."[16] This clause purports to subject any holder of the contract to all claims the buyer has against the seller.[17] By its plain language, the clause provides that "[a]ny holder" of the contract "is subject to all claims and defenses which the debtor could assert against the seller of goods" pursuant to the contract. *See* Retail Installment Contract (emphasis added). Furthermore, the only limit on assignee liability according to the language of the clause is that "[r]ecovery . . . by the debtor [against the assignee] shall not exceed amounts paid by the debtor." *Id.* Thus, were the plain language of the clause to control, plaintiff would be able to assert any cause of action against CAC which she might have against Auto Maxx, although plaintiff's recovery would be limited to the amount actually paid to Auto Maxx.[18]

Yet, notwithstanding the plain language of the clause, comments published in the Federal Register by the FTC suggest that the Holder Rule has certain limits not otherwise present in the clause's plain language. The FTC's comments confirm that the clause allows a buyer aggrieved by a breaching seller (i) to "defend a creditor suit for payment of an obligation by raising a valid claim against the seller as a setoff," and (ii) to bring "an affirmative action against a creditor who has received payments for a return of monies paid on account." 40 Fed.Reg. 53524 (Nov. 18, 1975). Yet, the FTC concluded that the latter, "affirmative" use of the clause would be available in rare circumstances, namely, "where a seller's breach is so substantial that a court is persuaded that rescission and restitution are justified." *Id.* In light of the FTC's comments, most courts have limited the affirmative use of the clause to those cases in which "rescission and restitution" are appropriate remedies, the consumer received "little or nothing of value," or there are otherwise "appropriate circumstances" justifying affirmative use of the clause.[19] In short, most courts have concluded that the pri-

---

cle by sale, gift, or any means other than by the creation of a security interest, and any person who, as agent, signs an odometer disclosure statement for the transferor." 49 C.F.R. 580.3.

15. *See* 49 C.F.R. § 580.3,

16. *See* 16 C.F.R. § 433.2.

17. In this regard, the contract here in issue provides as follows:

> ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

Because the clause is required by federal law, it is appropriate to interpret it as a federal regulation, rather than as a bargained–for contract provision. *See Taylor v. Quality Hyundai, Inc.,* 150 F.3d 689, 693–94 (7th Cir.1998). Thus, federal law governs construction of this clause.

18. CAC cites cases that indicate the FTC Holder Rule does not alter the limit on assignee liability in TILA, and suggests that any Odometer Act violation must therefore be apparent on the face of the disclosure statement. *See, e.g., Walker,* 155 F.3d at 935 ("[I]nclusion of the FTC's Holder Notice in a retail installment contract [does] not trump the clear command [of 15 U.S.C. § 1641(a) ] that subsequent assignees can be held liable under TILA only when the violation is apparent on the face of the disclosure statement."). The plain flaw in this argument is that plaintiff's claim is not brought pursuant to TILA; it is brought pursuant to the Odometer Act and the FTC Holder Rule, neither of which includes any such limitation on assignee liability.

19. *See Crews v. Altavista Motors, Inc.,* 65 F.Supp.2d 388, 391 (W.D.Va.1999) (limiting the affirmative use to cases where the consumer receives "little or nothing of value"); *Boggess v. Lewis Raines Motors, Inc.,* 20 F.Supp.2d 979, 982 (S.D.W.Va.1998) (holding that the affirmative use is appropriate only if rescission and restitution would be justified); *Mount v. LaSalle Bank Lake View,* 926

mary purpose of the clause is to provide a defense to claims brought by the creditor; any affirmative use of the clause has generally been limited to the rare situation when the seller's breach renders the transaction practically worthless to the consumer.[20]

Plaintiff in this case has alleged that Auto Maxx violated the Odometer Act, and seeks rescission of the installment contract on that basis. Specifically, plaintiff has alleged a discrepancy of nearly 40,000 miles between the mileage as represented and the actual mileage of the vehicle at the time of sale, a misrepresentation in excess of fifty percent. While it is unclear whether plaintiff will prevail on this claim, at least one district court in this circuit has concluded that a significant misrepresentation of a vehicle's mileage, if proven, may establish the basis for assignee liability under the Holder Rule, even under the limited liability discussed *supra.*[21] In any event, under the liberal pleading requirements of Rule 8, Fed.R.Civ.P., plaintiff has properly alleged a cause of action for rescission of the contract based on Auto Maxx's Odometer Act violation, and on that basis she may proceed with her claim against CAC for that same violation.[22] Thus, CAC's motion to dismiss Count IV of the Complaint must be denied.[23]

The Clerk is directed to forward copies of this Memorandum Opinion to all counsel

---

F.Supp. 759, 764–65 (N.D.Ill.1996); *Maberry v. Said,* 911 F.Supp. 1393, 1403 (D.Kan.1995) (limiting affirmative use of the clause to "appropriate circumstances"); *In re Hillsborough Holdings Corp.,* 146 B.R. 1015, 1020–21 (Bankr.M.D.Fla.1992); *Mardis v. Ford Motor Credit Co.,* 642 So.2d 701, 703–04 (Ala.1994) ("[B]ecause the [buyers] received an automobile of substantial value from [the seller] (although they may not have received the model that they thought they had contracted for), they had no basis under the FTC regulations to sue [the assignee] for the wrongdoing of [the seller]."); *Ford Motor Credit Co. v. Morgan,* 404 Mass. 537, 536 N.E.2d 587, 589–90 (1989) ("Thus, the function of the rule is to allow consumers to stop payments, and, in limited circumstances, ... where equity requires, to provide a return of monies paid.").

A few courts have concluded that the plain language of the clause should control, and that a plaintiff does not need to prove that "little or nothing of value" was delivered or that "rescission and restitution" are appropriate, in order to recover from the assignee. *See, e.g., Simpson v. Anthony Auto Sales, Inc.,* 32 F.Supp.2d 405, 409 n. 10 (W.D.La.1998) (refusing to limit the clause in this way); *Riggs v. Anthony Auto Sales, Inc.,* 32 F.Supp.2d 411, 416 n. 13 (W.D.La.1998) (same); *Oxford Finance Companies v. Velez,* 807 S.W.2d 460, 463 (Tex.App.1991) (same).

**20.** *See Crews,* 65 F.Supp.2d at 391 ("[T]he purpose of the Holder Rule is to provide both a shield and a (small) sword to consumers...."); *Mardis v. Ford Motor Credit Co.,* 642 So.2d at 703–04 (holding that defensive claims could be made with respect to a creditor's counterclaims pursuant to the clause, even though the same claims could not be an independent basis of damages); *Morgan,* 536 N.E.2d at 589–90 ("Thus, the function of the rule is to allow consumers to stop payments, and, in limited circumstances, ... where equity requires, to provide a return of monies paid.").

**21.** *See Boggess,* 20 F.Supp.2d at 982 (holding that a seller's representation of the mileage as 48,208 miles, while the actual mileage was 148,208 miles, established the basis for rescission and restitution as against the assignee).

**22.** The burden remains on the plaintiff to prove that the alleged Odometer Act violation is significant enough to establish CAC's liability under the clause. This burden may be difficult to meet, as a superficial analysis using the Kelly Blue Book Web Page suggests that the difference in value between two, well-maintained 1991 4–door Nissan Sentras, one with 113,000 miles and the other with 73,000 miles, is only about $400.00. *See* Kelly Blue Book (visited January 4, 2000) <http://www.kbb.com>. Furthermore, if plaintiff continues to enjoy the use of the car, a fact about which the current record is silent, an affirmative claim under the Holder Rule may be difficult to sustain. *See Crews,* 65 F.Supp.2d at 391 (noting that continued use of the vehicle negates the claim that the vehicle had little or no value). In any event, when considering a motion to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P., the complaint should be construed in the light most favorable to the plaintiff. *See Mylan Laboratories, Inc. v. Matkari,* 7 F.3d 1130, 1134 (4th Cir.1993). Thus, these facts are not dispositive at this stage of the litigation.

**23.** Nothing in this opinion is intended to be dispositive of plaintiff's TILA and Odometer Act claims against Auto Maxx.

of record. An appropriate order will enter.