Timothy G. KNAPP and Angela D. Knapp, individually and on behalf of all others similarly situated, Plaintiffs,

v.

AMERICREDIT FINANCIAL SERVICES, INC., Cox Pontiac–Buick, Inc. d/b/a Crown–Pontiac–Buick–GMC, Inc., and Henry Marino, Defendants.

No. CIV.A. 2:01–0788.

United States District Court,
S.D. West Virginia,
Charleston Division.

Feb. 18, 2003.

Daniel J. Konrad, R. Kemp Morton, James C. Stebbins, Huddleston, Bolen, Beatty, Porter & Copen, Huntington, WV, Eugene J. Kelley, Jr., John L. Ropiequet, Christopher S. Naveja, EArnstein & Lehr, Chicago, IL, for Defendant Americredit.

Forrest Jones, Jr.,Thomas L. Linkous, Jones & Associates, Charleston, WV, for Defendant Crown–Pontiac–Buick–GMC, Inc.

Larry G. Kopelman, Kopelman & Associates, Charleston, WV, for Defendant Henry Marino.

## MEMORANDUM OPINION AND SCHEDULING ORDER

HADEN, District Judge.

Pending are the motions of all Defendants for summary judgment on all counts of Plaintiffs' Second Amended Complaint. For reasons discussed below, the motions are **GRANTED** in part and **DENIED** in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

As is necessary at summary judgment, the facts are presented in a light most favorable to the non-movant. Two former salesmen from Defendant Crown–Pontiac–Buick–GMC, Inc. ("Crown"), who handled what was called "special finance," [1] Jeffrey Preece and Kenneth Burgess, testified that the processing of loans when working with Americredit Financial Services, Inc. ("Americredit"), was different than that used in auto sale and financing with other lenders. According to Preece and Burgess, Bob Bumpus, area manager of Americredit, trained the two in this loan processing program.

Daniel F. Hedges, Charleston, WV, for Plaintiff.

---

1. Crown customers who did not qualify for bank financing were sent to Preece's "special finance" department. (Def. Americredit's Mot. for Summ. J., Ex 3, Preece dep. at 15–16.)

The first step in the program involved advertising loans for used car buyers with weak credit. When potential customers responded, the special finance people like Preece and Burgess first took the credit application and faxed it to Americredit. Sometimes Americredit approved the original application, in which case Crown looked for a car for which they could structure a deal within the approved monthly payment. More often than not, however, Americredit disapproved the initial application and the deal would have to be "rehashed," which meant negotiating an acquisition fee, the amount Crown paid Americredit to finance the purchase, and making other adjustments in the application. Bumpus testified the acquisition fee was based on the customer's credit worthiness: the greater the credit risk, the greater the fee. Bumpus testified the fees ranged from zero to four hundred ninety-five dollars ($495), but could be as high as eight hundred ninety-five ($895) and possibly a thousand dollars ($1000).

Bumpus trained Preece and Burgess to include false downpayments on the applications, indicating customers had made a downpayment that, in fact, they were not required to make. In the Knapps' case, for example, the documents indicated they had paid two thousand dollars ($2000) down. The truth was they made no down payment. Elsewhere Crown employees called this "funny money" or "Crown rebates" or "KBC" for "Kenny Burgess cash," and they simply raised the stated car price to cover the false downpayment. The false downpayment also affected the acquisition fee. Burgess testified, "If [Bumpus] knew it was KBC, a lot of times he'd want a couple extra hundred dollars

or sometimes as much as up to a thousand." (Burgess Dep. at 22.)

During rehashing, customers' paystubs were falsified to indicate more income and increase the apparent credit-worthiness of their application. Bumpus taught Burgess and Preece to perform these operations and he worked with them to adjust each indicator until the customer's credit appeared to score satisfactorily so Americredit could approve a car loan. Working with the resulting payment figure, Crown found a car the customer could "afford" to purchase within the payments Americredit required. The car price included the acquisition fee in every case, according to Burgess and Preece.[2] (See Pl.'s Resp. to Defs.' Mot. for Summ. J., Ex. Burgess Dep. at 23, 84–85, 126; Preece Dep. at 35–36.) Burgess quoted Crown General Manager Henry Marino saying, "[T]hese rats [Americredit], I'm not paying their damn fee." (Id., Burgess Dep. at 83.)

According to Preece and Burgess, the dealer would draw up the contract for the car purchase with Americredit as assignee for the customer to sign, but copies of the transaction documents were not sent to the customer until Americredit paid Crown. According to Preece, "Henry [Marino] told me never to give them paperwork until we had received funding for the deal. Never give them copies of their paperwork until then." (Id., Ex. Preece Dep. at 32.) Burgess concurred: "[W]e wouldn't give them copies of a contract until it was funded from Americredit because there may be an argument with Bumpus over a fee or something, that I couldn't increase the price of the car to cover his fee enough." (Id., Ex. Burgess Dep. at 27.) Burgess quoted Marino, " [T]hem rats ain't going to hang me on

---

**2.** Crown points to Preece's statement, which appears to contradict his earlier testimony, "We did not add the acquisition fee to the already established sales price." (Preece Dep. at 137.) This apparent inconsistency raises, and does not resolve, a question of fact.

one of them.... I'm not giving them papers until I get my money." (*Id.* at 28.)

When the Knapps responded to a radio advertisement for special financing at Crown, they completed a loan application and were told they were approved up to thirteen thousand dollars ($13,000). On February 1, 2001 they purchased a 1999 Pontiac Sunfire. The vehicle price was thirteen thousand ninety-one dollars and ninety-two cents ($13,091.92), including the false $2000 downpayment. The Knapps say they received copies of the contract and disclosure statement about March 2, 2001. Just above the signatures on the installment contract, a notice states, "BY SIGNING BELOW BUYER AGREES TO THE TERMS OF PAGES 1 AND 2 OF THIS CONTRACT AND ACKNOWLEDGES RECEIPT OF A COPY OF THIS CONTRACT."

Plaintiffs' Second Amended Complaint alleges the acquisition fee was hidden in the cash price of the vehicle. Because the fee was actually a hidden finance charge, Plaintiffs' allege, it should have been, but was not included in the disclosure of the amount financed, as required by the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* Defendants also failed to provide disclosures required by TILA to consumers prior to consummation of the purchase and financing of the vehicle. In addition to the TILA claims, Plaintiffs allege state law claims based on the same activities for excessive finance charges, joint venture and conspiracy, unfair and deceptive acts or practices ("UDAP"), and fraud. According to the Complaint, Defendant Henry Marino directed the actions of the car dealer. Defendants have moved for summary judgment on all counts.

## II. DISCUSSION

### A. Summary Judgment Standard

Our Court of Appeals has often stated the settled standard and shifting burdens governing the disposition of a motion for summary judgment:

Rule 56(c) requires that the district court enter judgment against a party who, "after adequate time for ... discovery fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." To prevail on a motion for summary judgment, the [movant] must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact has been raised, we must construe all inferences in favor of the [nonmovant]. If, however, "the evidence is so one-sided that one party must prevail as a matter of law," we must affirm the grant of summary judgment in that party's favor. The [nonmovant] "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." To survive [the motion], the [nonmovant] may not rest on [his] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. As the *Anderson* [*v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)] Court explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff[.]"

*Harleysville Mut. Ins. Co. v. Packer,* 60 F.3d 1116, 1119–20 (4th Cir.1995) (citations omitted); *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994); *see also Cabro Foods, Inc. v. Wells Fargo Armored Serv. Corp.,* 962 F.Supp. 75, 77 (S.D.W.Va.

1997); *Spradling v. Blackburn*, 919 F.Supp. 969, 974 (S.D.W.Va.1996).

"At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried. If not, the district court may resolve the legal questions between the parties as a matter of law and enter judgment accordingly." *Thompson Everett, Inc. v. National Cable Adver., L.P.* 57 F.3d 1317, 1323 (4th Cir.1995). It is through this analytical prism the Court evaluates the parties' motions.

### B. Count I: Hidden Finance Charge

#### 1. Crown Liability

■ Congress enacted TILA "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair billing and credit card practices." 15 U.S.C. § 1601(a). To this end, TILA requires creditors to disclose clearly and accurately to consumers any finance charge that the consumer will bear under the credit transaction. *See* 15 U.S.C. § 1638(a)(3). The disclosure requirements are designed to prevent creditors from circumventing TILA's objectives by burying the cost of credit in the price of goods sold. *See Mourning v. Family Publications Serv., Inc.,* 411 U.S. 356, 364, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973).

TILA defines the "finance charge" as the "sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to

the extension of credit." 15 U.S.C. § 1605(a). Regulation Z, the compiled TILA implementing regulations, provides:

> The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.

12 C.F.R. § 226.4(a). Further, Regulation Z provides the term "finance charge" includes "[c]harges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation." *Id.* § 226.4(b)(6).

■ Undisputed testimony shows Americredit charged Crown an acquisition fee for funding customers' retail automobile purchases. The acquisition fee was based on the customers' credit-worthiness; the weaker the customer, the higher the fee. The fee for acquiring the Knapps' credit purchase was $695.' Clearly, the acquisition fee is a TILA finance charge, if the consumer is required to pay it. Both salesmen, Preece and Burgess, testified the acquisition fee was added to the price of every special finance car. (Burgess Dep. at 23; 84–85; Preece Dept. at 35–36.) Crown responds, however, that the acquisition fee was a cost of doing business, a cost that Crown paid to Americredit.

■ Such charges are exempted from TILA's disclosure requirements by the Federal Reserve Board's Official Staff Commentary to Regulation Z: [3]

---

**3.** The Official Staff Commentary to Regulation Z is dispositive "unless demonstrably irrational." *See Ford Motor Credit Co. v. Mil-*

*hollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980).

*Costs of Doing Business.* Charges absorbed by the creditor as a cost of doing business are not finance charges, even though the creditor may take such costs into consideration in determining the interest rate to be charged or the cash price of the property or services sold. *However, if the creditor separately imposes a charge on the consumer to cover certain costs, the charge is a finance charge if it otherwise meets the definition.* For example:

A discount imposed on a credit obligation when it is assigned by a seller-creditor to another party is not a finance charge as long as the discount is not separately imposed on the consumer.

12 C.F.R. Pt. 226, Supp. I at 308–09 (emphasis added). Crown argues there is no evidence the acquisition fee was "separately imposed" upon the Knapps, to make it a finance charge.

Courts have variously interpreted "separately imposed." For example, one court held, without discussion, that a discount was not separately imposed if it was included in the purchase price. *See Sampson v. Mercury Fin. Co.*, 1996 WL 1057530 (M.D.Ala.1996). As the Seventh Circuit explained, however, in an extensive analysis, this practice would allow unscrupulous car dealers to evade TILA "by hiding a portion of the finance charge in the cash price of the vehicle." *Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927, 933, n. 8 (7th Cir.1998). For that reason, the *Sampson* account would contravene *Mourning* and the Supreme Court's directive that creditors not be allowed to contravene TILA by burying the cost of credit in the price of goods. *See also Irby–Greene v. M.O.R., Inc.*, 79 F.Supp.2d 630, 633 (E.D.Va.2000)(same).

Alternatively, *Walker* holds a charge should be considered "separately imposed" on a credit consumer "when it is imposed in credit transactions but not in cash transactions." *Id.* at 934; *see also Irby–Greene* at 633 (cost is "separately imposed" if seller, to cover cost, would have charged a credit customer a higher price than a cash customer). Regulation Z supports this analysis, providing a charge imposed directly or indirectly by a creditor is not a finance charge, if it is "imposed uniformly in both cash and credit transactions." 12 C.F.R. § 226.4(a) & Pt. 226, Supp. I at 308. This Court adopts the Seventh Circuit's standard in *Walker* as reasonable, well analyzed, and supporting TILA's purpose.

Salesmen Burgess and Preece testified the acquisition fee was determined based on the credit-worthiness of individual customers needing special financing and added into the price of whatever vehicle was then proposed to that customer. Crown disagrees, arguing the only credible evidence shows that the acquisition fee was treated as a cost of doing business. The automatic deposit slips provided by Americredit to Crown show Americredit withheld the acquisition fee and paid the remainder of the amount financed to Crown. For example, the Knapps financed eleven thousand seventy-seven dollars and forty-two cents ($11,077.42) of which ten thousand, three hundred eighty-two dollars and forty-eight cents ($10,382.48) was paid to Crown and six hundred ninety-five dollars ($695.00), the acquisition fee, was deducted and withheld by Americredit. In conjunction with the salesmen's testimony that the acquisition fee was added into the price of every car sold with special financing by Americredit, a reasonable jury could interpret this transaction to show that the Knapps financed both the acquisition fee and the amount they paid Crown for their car.

This question of fact, whether Crown "separately imposed" the acquisition fee on credit customers precludes summary judgment on this issue. Crown's motion for summary judgment on *Count* I is **DENIED**.

### 2. Americredit Liability

■ Plaintiffs assert Americredit is liable for TILA violations both as an assignee under TILA and as a principal and participant in the loan transaction. The cases relied upon, however, are either outdated or distinguishable. The relevant holding of *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 220–21 (4th Cir.1978), the principal case that Plaintiffs cite, was abrogated by October 1, 1982 amendment of 12 C.F.R. § 226.2 removing the definition, "arranger of credit." *See* 12 C.F.R. Pt. 226, Supp. I.

Under TILA, assignee liability for TILA disclosure violations is limited to violations "apparent on the face of the disclosure statement." 15 U.S.C. § 1641(a). Such a violation includes "a disclosure which can be determined to be incomplete or inaccurate from the face of the disclosure statement or other documents assigned." *Id.* § 1641(a)(1). Plaintiffs argue examination of the other documents assigned, as in *England v. MG Investments, Inc.*, 93 F.Supp.2d 718 (S.D.W.Va.2000), *Hays v. Bankers Trust Co.*, 46 F.Supp.2d 490(S.D.W.Va.1999), and *Herrara v. The North & Kimball Group, Inc.*, 2002 WL 253019 (N.D.Ill.2002), would have revealed the hidden finance charge. In each case, other documents assigned, for example, loan closing documents, revealed the discrepancy. Here, however, Plaintiffs identify no other *documents assigned* from which Americredit could have determined an inaccuracy.[4]

■ Americredit represents that, even if Crown did hide a finance charge in the price of the car and, ultimately, in the amount financed, nothing on the face of documents assigned would indicate that fact to the assignee. Even if Preece and Burgess' testimony that Americredit's agent worked with them to determine the acquisition fee and then increase the car price is believed, that knowledge, imputable to Americredit, is nonetheless irrelevant. "An assignee's sole duty under TILA is to examine the assigned documents for any irregularities, even if the assignee has knowledge that a creditor's contracting practices may otherwise violate TILA." *Irby–Greene* at 633 & n. 12. (citing *Taylor v. Quality Hyundai, Inc.*, 150 F.3d 689, 694 (7th Cir.1998); *Green v. Levis Motors, Inc.*, 179 F.3d 286, 295 (5th Cir.1999)(holding that an assignee has no duty to inquire beyond the face of the assigned documents); *Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 709 (11th Cir.1998)(holding that a plaintiff may not "resort to evidence or documents extraneous to the disclosure statement" to determine assignee liability under TILA))(other citation omitted).

Plaintiffs have presented no evidence of discrepancies, irregularities, or false statements that would be apparent on the face of documents assigned to Americredit and, accordingly, summary judgment is GRANTED to Americredit on *Count* I.

### C. Count II: Failure to Provide Timely and Accurate TILA Disclosures

■ *Count* II alleges several TILA-required disclosures were not made accu-

---

4. The automatic deposit form showing Americredit withheld the acquisition fee is not sufficient on its own to demonstrate the fee was separately imposed. That document only shows the fee was separately collected. The question remains, did Crown charge the Knapps first by raising the car price and then allow Americredit to collect that addition by withholding it from the amount financed.

rately by Crown because of its failure to disclose the hidden finance charge. This allegation presumes there was a hidden finance charge, as discussed above. The questions of fact regarding the pricing of special finance automobiles and attribution of the acquisition fee, discussed above, also preclude summary judgment for Crown on this issue. Because Americredit is an assignee, its TILA liability is limited to disclosure failures apparent on the face of the documents assigned, as discussed above, and because Plaintiffs have identified none, summary judgment is **GRANTED** to Americredit on this portion of *Count* II.

*Count* II further alleges Defendants failed to declare the annual percentage rate and finance charge more conspicuously than all other disclosures except the creditor's identity. *See* 15 U.S.C. § 1632(a); 12 C.F.R. § 226.17(a). The Court has examined the disclosure statement and notes this appears to be true. Conspicuity being a question of fact, however, final judgment will be reserved for a jury. If true, it is apparent on the face of the disclosure statements and so may be maintained against Americredit as against Crown. Defendants' motion for summary judgment on this issue in *Count* II is **DENIED.**

Finally, *Count* II alleges Defendants failed to deliver the required disclosures in a form the consumer may keep prior to consummation. TILA requires the seller to disclose the terms of credit to the buyer. 15 U.S.C. § 1638(b)(1). Regulation Z specifies how the disclosure should be made:

(a) Form of disclosures.

(1) The creditor shall make the disclosures required by this subpart clearly and conspicuously in writing, in a form that the consumer may keep.

(b) Time of disclosures. The creditor shall make disclosures before consummation of the transaction.

12 C.F.R. § 226.17. The Fourth Circuit recently held this regulation means the seller is "required to make the disclosures to [the buyer] in writing, in a form that he could keep, before consummation of the transaction." *Polk v. Crown Auto, Inc.,* 221 F.3d 691, 692 (4th Cir.2000).

■ The retail installment contract signed by the Knapps on February 1, 2001 states, just above the signatures, "BY SIGNING BELOW BUYER ... ACKNOWLEDGES RECEIPT OF A COPY OF THIS CONTRACT." For purposes of assignee liability under TILA, Americredit may rely on the face of the contract including this acknowledgement, and its motion for summary judgment on this issue is **GRANTED.** For Crown, however, this acknowledgement only creates a rebuttable presumption of delivery, 15 U.S.C. § 1635(c), a presumption that cannot stand in the face of testimony that the Knapps left the office without the TILA disclosure form and did not actually receive it in a form they could keep until March 2001. Corroborative testimony from salesmen Preece and Burgess asserts it was the routine pattern and practice of Crown not to make disclosures available to customers in a form they could keep until after Americredit had paid Crown. Crown's motion for summary judgment on this issue is **DENIED.**

**D. Count III: Excessive Finance Charge**

■ *Count* III alleges that the total disclosed finance charge of six thousand eight hundred eighty-four dollars and seventy-eight cents ($6,884.78) plus the undisclosed acquisition fee of six hundred ninety-five dollars ($695) violates West Virginia Code §§ 46A–3–101 to 104, which regulate fi-

nance charge rates or, in other words, is usurious. Plaintiffs allege the credit transactions with Americredit were consumer loans, rather than a loan incident to a consumer credit sale. On Plaintiffs' account, because Americredit's agent Bob Bumpus participated with Crown in determining the financing, the seller is actually acting as an agent of the lender to sell the loan. If the transaction was a consumer loan rather than a consumer credit sale, the maximum interest rate of eighteen percent (18%) would apply, rather than twenty-five percent (25%) that applies to retail installment sales.[5]

In pertinent part, a "consumer credit sale" is a "sale of goods ... in which credit is granted ... by a seller who regularly engages as a seller in credit transactions of the same kind; ... the buyer is a person; ... the goods are purchased primarily for a personal, family [or] household purpose; ... the debt is payable in installments... and the amount financed does not exceed forty-five thousand dollars." W. Va.Code § 46A–1–102(13)(a). A "consumer loan" is a "loan made by a person regularly engaged in the business of making loans," the other conditions being the same. *Id.* at § 102(15).

■ Americredit first contends, as assignee it cannot be liable for any state violations because TILA preempts "inconsistent" state law. *See* 15 U.S.C. § 1610(a). Although Congress has acted comprehensively in the field of retail installment credit in the TILA, it has not seen fit to regulate interest rates in that field. Moreover, Congress expressly deferred to state authority. TILA provides pertinently:

> Except as provided in section 1639 of this title [requirements for certain mort-

gages], this subchapter does not otherwise annul, alter or affect in any manner the meaning, scope or applicability of the laws of any State, including, but not limited to, laws relating to the types, amounts or rates of charges, or any element or elements of charges, permissible under such laws in connection with the extension or use of credit[.]

15 U.S.C. § 1610(b). TILA expressly does not preempt West Virginia usury law. *See also Williams v. First Gov't Mtge. & Investors Corp.*, 176 F.3d 497, 499–500 (D.C.Cir.1999)(TILA mandates disclosure of documents in lending transactions; states remain free to impose greater protections for borrowers, including substantive protections against unconscionable loan terms and provisions).

Plaintiffs' claim in *Count* III is that Americredit actually sought to sell its consumer loan to the Knapps, so that the Knapps' transaction with Crown was not actually a consumer credit sale. As summarized:

> When all indicia are examined, the Americredit process varies substantially from a standard auto purchase and financing transaction: The financing is the advertised commodity; the credit terms (including monthly payment) are dictated by Americredit; the loan is generally arranged before a vehicle is selected (then often selected by the seller rather than the buyer); the contract contain[s] expression of fees based on credit risk, pushing the contract higher than the rate permitted by law; there is splitting of profit between the seller and lender; Americredit is the owner of the contract (filled in with Americredit as assignee) prior to consummation by the consumer.

---

**5.** Americredit, as assignee of Crown's retail installment contract, may also collect interest up to twenty-five percent as specified in that contract. *See* W. Va.Code § 46A–3–104(5).

(Pls.' Resp. to Defs.' Mots. for Summ. J. at 16.)

Plaintiffs' account ignores the subject of the transaction, however. The Knapps purchased a 1999 Pontiac Sunfire. The car is the loan collateral. There is no evidence that, absent the car, the Knapps would have qualified for such a loan. The Knapps responded to an advertisement for people with credit problems to purchase cars. They did not seek money, they sought a vehicle. The vehicle loan was not arranged before the vehicle was selected. Rather, the terms of an agreement under which Americredit would be willing to finance an automobile purchase by the Knapps were discussed. Burgess and Preece testified customers were shown several cars they could afford, given the financing for which they were eligible.[6] The parties agree Americredit charged a fee based on credit risk, but whether the fee was paid by Crown or the Knapps is a question for the jury. However, even if the Knapps paid the acquisition fee, that does not change their car purchase into a consumer loan. On the facts presented, a reasonable jury could not find otherwise. Americredit's motion for summary judgment on *Count* III is **GRANTED**.

### E. Count V: Unfair and Deceptive Acts and Practices [7]

█ *Count* V alleges Defendants suppressed the pattern and practice of adding on unauthorized charges for the hidden finance charge with the intention and purpose of deceiving Plaintiffs and so created a likelihood of confusion and misunderstanding. W. Va.Code § 46A–6–104.

Americredit responds that Section 1641(a) of TILA, which preempts inconsistent state law, provides a complete defense to West Virginia claims for unfair and deceptive acts and practices (UDAP) claims. In support, Americredit cites cases holding that Holder Rule clauses in contracts, that is, clauses that extend a debtor's claims and defenses against a seller to the contract holder, are inconsistent with assignee liability under TILA and thus preempted, pursuant to § 1641(a). *See Alexiou v. Brad Benson Mitsubishi,* 127 F.Supp.2d 557 (D.N.J.2000); *Graham v. RRR, LLC,* 202 F.Supp.2d 483 (E.D.Va. 2002). However, Plaintiffs do not seek to hold Americredit liable as assignee via the contract's holder clause. Rather, the lender's liability is predicated upon the direct involvement of Americredit's employee and agent, Bumpus, in the planning and execution of the scheme involving false pay stubs, false downpayments, and an acquisition fee.

Americredit next contends that UDAP statutes do not provide for derivative liability against those who do not deal directly with consumers. (Def. Americredit's Mot. for Summ. J. at 18 (citing Texas, Illinois and Tennessee caselaw).) Again, Americredit's alleged liability is not the derivative liability of an assignee. Americredit's potential liability derives from the actions of its agent Bumpus in allegedly planning, managing, and executing the scheme in which customers were dealt

---

**6.** Admittedly, the Knapps became eligible for financing because their apparent eligibility had been manipulated through indication of a false downpayment. Because of the Knapps' manipulated eligibility for a car loan, Crown sold a car and Americredit made the loan. That manipulated eligibility, however, does not alter the retail installment contract transaction into a loan. The loan remains incident to the car sale.

**7.** *Count* IV alleges Defendants engaged in a joint venture and conspiracy to commit the unlawful acts or lawful acts by unlawful means alleged in *Counts* I through VI. Accordingly, the Court considers *Counts* v. and VI before resolving *Count* IV issues.

with by creation of false pay stubs, false downpayments, and charging an acquisition fee hidden in the vehicle price.

Finally, Americredit, Crown and Marino argue that Plaintiffs have failed to present evidence they have suffered the requisite "ascertainable loss... as a result of the use of" the unfair act or practice of which they complain. (*Id.* at 19 (citing *State of West Virginia v. Sec'y of Educ.*, 1993 WL 545730 at \*14 (S.D.W.Va.1993); *Orlando v. Finance One of West Virginia, Inc.*, 179 W.Va. 447, 453, 369 S.E.2d 882, 888 (1988)).) If, as Plaintiffs allege, the acquisition fee was hidden in the car price and amount financed. Plaintiffs at least paid state tax on the vehicle purchase in an excessive amount, which is an ascertainable loss.

For all these reasons, Defendant Americredit and Crown's motions for summary judgment on *Count* V, the UDAP claim, are **DENIED**.

### F. Count VI: Fraud

 *Count* VI alleges Defendants suppressed the pattern and practice of adding on unauthorized charges for a hidden finance charge, excessive sales tax and payments.[8] The essential elements in an action for fraud are: "(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it." Syl. Pt. 1, *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981). Fraudulent concealment involves the concealment of facts by one with knowledge or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud.

*Trafalgar House Constr., Inc. v. ZMM, Inc.*, 211 W.Va. 578, 567 S.E.2d 294, 300 (2002)(citing *Silva v. Stevens*, 156 Vt. 94, 589 A.2d 852, 857 (1991)).

Americredit claims the undisputed facts show that only Crown set the car price and, if the finance charge was hidden therein, it was hidden by Crown. Burgess, however, testified that Bumpus talked to him about the acquisition fee as a component of the price of the vehicle (Burgess dep. at 124), and that, although Bumpus did not tell Burgess to put the fee into purchase price, he knew they were doing it. (*Id.* at 222.) Similarly, Preece testified Bumpus knew the acquisition fee was built into the cash price of the vehicle in every case. (Preece dep. at 37.) Because questions of fact preclude summary judgment on *Count* VI, Americredit and Crown's motions for summary judgment on this count are **DENIED**.

### G. Count IV: Joint Venture/Conspiracy

 *Count* IV alleges the Defendants engaged in a joint venture or conspiracy to commit the unlawful acts complained in *Counts* I through VI. A civil conspiracy is "a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." *Salmons v. Prudential Ins. Co. of Am.*, 48 F.Supp.2d 620, 625 (S.D.W.Va.1999)(citing *Dixon v. Am. Indus. Leasing Co.*, 162 W.Va. 832, 834, 253 S.E.2d 150, 152 (1979)).

As demonstrated above, for each count which remains, testimony of Burgess and Preece supports Plaintiffs' allegations that Bumpus trained the two in the schemes and worked with them to carry out cre-

---

**8.** *Count* VI also alleges Defendants concealed information concerning the vehicle's condition. Defendants point out Plaintiffs have produced no evidence in support of this contention. Accordingly, summary judgment is GRANTED to Defendants on this issue.

ation of false paystubs, false downpayments, and charging an acquisition fee in addition to interest of twenty-one percent (in the Knapps' case), which Bumpus knew Preece and Burgess were including in the cash price of the vehicle. These questions must be put to a jury and, accordingly, Defendants' motion for summary judgment on *Count* IV is **DENIED**.

### H. Henry Marino

 Defendant Marino was the General Manager of Crown throughout the time period of the wrongful activities alleged. Burgess and Preece testified that Marino knew about and participated in all the special financing activities. In particular, testimony of the salesmen supports that Marino oversaw and approved the hiding of the acquisition fee in the cash price of the vehicle.

Marino argues he is not a "creditor" or person to whom the debt is payable under 15 U.S.C. § 1602(f) and so is not liable for TILA violations because it is the creditor who is required to make TILA disclosures. *See e.g.,* 15 U.S.C. § 1638(a). While the Court agrees that Crown and not Marino is the creditor and subject to TILA liability, Marino is not insulated from liability on the state claims that remain. Marino's motion to dismiss himself as an individual Defendant is **DENIED**.

### III. CONCLUSION

Americredit's motion for summary judgment on *Counts* I, II (except for conspicuousness of the disclosures), and III is **GRANTED**. Americredit's motion for summary judgment on the remaining counts is **DENIED**. Crown's motion for summary judgment on all counts is **DENIED**. Marino's motion for summary judgment on *Counts* I, II, and III is **GRANTED**; however, summary judgment on *Counts* IV, V, and VI is **DENIED**.

A status conference is SCHEDULED for Monday, February 24, 2003 at 3:00 p.m. Parties who wish to participate by telephone should inform the Court by Friday, February 21, 2003.

The Clerk is directed to send a copy of this Order to counsel of record and post it on the Court's website: http://www.wvsd.uscourts.gov