In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2220

ELENA FRIDMAN, individually and on
behalf of a class,

*Plaintiff-Appellant,*

*v.*

NYCB MORTGAGE CO., LLC,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 03094 — **Sara L. Ellis**, *Judge.*

ARGUED NOVEMBER 3, 2014 — DECIDED MARCH 11, 2015

Before WOOD, *Chief Judge*, and EASTERBROOK and
HAMILTON, *Circuit Judges*.

WOOD, *Chief Judge*. Like many consumers today, Elena
Fridman paid her mortgage electronically, using the online
payment system on the website of her mortgage servicer,
NYCB Mortgage Company, LLC. By furnishing the required
information and clicking on the required spot, she author-
ized NYCB to collect funds from her Bank of America ac-

count. The question before us concerns the time when NYCB received one of her payments. Although Fridman filled out the form within the grace period allowed by her note, NYCB did not credit her payment for two business days. This delay caused Fridman to incur a late fee. Believing that her payment should not have been treated as late, Fridman brought this suit in the district court on behalf of herself and a putative class. She alleged that NYCB's practice of not crediting online payments on the day that the consumer authorizes them violates the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.* The district court read the law differently and granted NYCB's motion for summary judgment. Fridman appealed, and we now reverse the district court's order and remand for further proceedings.

**I**

Like a great many financial institutions, NYCB accepts mortgage payments through its website, http://www.mynycb.com, as well as through mail, telephone, and wire transfer. A consumer whose personal bank account is not with NYCB makes an online payment by signing on to her NYCB loan account and providing the routing and account numbers for her external bank account. Next, the consumer electronically authorizes NYCB to debit her bank account by clicking a "submit payment" button. NYCB withdraws funds from the consumer's account through the Electronic Payments Network (EPN), which is an Automated Clearing House (ACH). Each business day, NYCB compiles electronic authorizations into an ACH file. The next day, it uses that file to request the transfer of funds from its consumers' banks through the EPN. Consumer electronic authorizations submitted before 8:00 p.m. Eastern Time on a business day are

included in that day's ACH file, while authorizations sub-mitted after that time are placed in the next business day's file. NYCB credits payments made through its website two business days after an electronic payment is submitted. (The company notifies its consumers of this lag time on the electronic-authorization webpage.) NYCB's rationale for the delay is that two business days represents "the earliest NYCB can receive the electronic funds transfer through the ACH network from its consumers' banks." It does not, however, make consumers wait longer than two days for a payment to be credited, even if a problem with the ACH processing system causes a delay in NYCB's actual receipt of the funds.

NYCB services Fridman's mortgage. The mortgage requires payment on the first day of each month, with a 15-day grace period before she must pay a late fee. In December 2012, Fridman used NYCB's website to authorize NYCB to transfer funds electronically from her Bank of America checking account. Fridman completed the electronic authorization on either the evening of Thursday, December 13, 2012 (after the 8:00 p.m. cutoff time), or the morning of Friday, December 14, 2012. In keeping with its policy, NYCB did not credit Fridman's mortgage account until Tuesday, December 18, 2012, two business days later, and three days after the expiration of the grace period. (This was also the day that Fridman's Bank of America account was debited.) NYCB charged Fridman a late fee of $88.54.

Fridman brought this lawsuit under TILA's civil liability provision, 15 U.S.C. § 1640. She asserted that TILA requires mortgage servicers to credit electronic payments on the day of the authorization. NYCB persuaded the district court that the relevant time under the statute for crediting such a pay-

ment is when the mortgage servicer receives the funds from the consumer's external bank account. Whether that is correct is the sole issue on appeal. As nothing but questions of law are presented, our review is *de novo*. *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 488 (7th Cir. 2014).

**II**

TILA generally requires mortgage servicers to credit payments to consumer accounts "as of the date of receipt" of payment, unless delayed crediting has no effect on either late fees or consumers' credit reports. 15 U.S.C. § 1639f(a). This provision's implementing regulation, known as Regulation Z, essentially repeats this requirement. See 12 C.F.R. § 1026.36(c)(1)(i) ("No servicer shall fail to credit a periodic payment to the consumer's loan account as of the date of receipt … ."). But what is the date of receipt? That question, on which the result in this case turns, is more complicated than one might think. The Consumer Financial Protection Bureau's (CFPB) Official Interpretations of Regulation Z ("Official Interpretations") define the term "date of receipt" as follows:

> 1. Crediting of payments. Under § 1026.36(c)(1)(i), a mortgage servicer must credit a payment to a consumer's loan account as of the date of receipt.
>
> …
>
> 3. Date of receipt. The "date of receipt" is the date that the payment instrument or other means of payment reaches the mortgage servicer. For example, payment by check is re-

ceived when the mortgage servicer receives it, not when the funds are collected. If the consumer elects to have payment made by a third-party payor such as a financial institution, through a preauthorized payment or telephone bill-payment arrangement, payment is received when the mortgage servicer receives the third-party payor's check or other transfer medium, such as an electronic fund transfer.

Official Interpretations, 12 C.F.R. pt. 1026, Supp. I, pt. 3, at § 1026.36(c)(1)(i).

That is what the CFPB thinks, but the first question we must address is what weight we should give to its views. The Official Interpretations for Regulation Z were adopted in wholesale form, minus a few technical changes, from the Federal Reserve Board (FRB) Staff Commentary (also known as the "Official Staff Interpretations") on Regulation Z. See *Truth in Lending (Regulation Z)*, 76 Fed. Reg. 79,768-01 (Dec. 22, 2011). (Before the CFPB assumed responsibility for Regulation Z, the Federal Reserve Board was charged with this task.) Courts gave deference to the FRB Staff Commentary on Regulation Z unless the opinion was "demonstrably irrational." See *Hamm v. Ameriquest Mortgage Co.*, 506 F.3d 525, 528 (7th Cir. 2007) (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980)). The Federal Reserve, however, did not use the formal notice-and-comment procedure before issuing its interpretations, while the CFPB has that authority. We acknowledge that future CFPB Official Interpretations adopted pursuant to notice-and-comment rulemaking may merit deference under the framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S.

837 (1984). The CFPB itself seems to contemplate that its Official Interpretations are a more authoritative source than the FRB Staff Commentary that preceded them. Compare 12 C.F.R. pt. 1026, Supp. I, pt. 1, at Introduction ("This commentary is the vehicle by which *the Bureau of Consumer Financial Protection* issues official interpretations of Regulation Z.") (emphasis added), with 12 C.F.R. pt. 226, Supp. I, at Introduction ("This commentary is the vehicle by which *the staff of the Division of Consumer and Community Affairs of the Federal Reserve Board* issues official staff interpretations of Regulation Z.") (emphasis added). Nevertheless, for present purposes it is enough to say that the CFPB's Official Interpretation of section 1026.36(c)(1)(i) of Regulation Z, which was transferred from the FRB's Staff Commentary on that section, is not "demonstrably irrational." TILA expressly requires servicers to "credit a payment … as of the date of receipt," and the Official Interpretations define the "date of receipt" as when the "payment *instrument* or other means of payment reaches the mortgage servicer." (Emphasis added.) This definition is far from irrational. While the CFPB (and the FRB before it) could have determined that "payment" means the *receipt* of funds by the servicer, the conclusion that "payment" refers to the consumer's act of making a payment is equally sensible.

The definition is not limited to one type of payment instrument versus another type. It instead covers all instruments used to effect payment, and then it specifies that no matter what the means of payment, the relevant date of receipt is the day when the payment mechanism reaches the mortgage servicer, not any later potentially relevant time. With this much established, we are left with the question

how electronic authorizations fit into the statutory and regulatory system. Fridman argues that an electronic authorization of payment, such as the authorization she gave when she filled out NYCB's online form, qualifies as a "payment instrument or other means of payment." In NYCB's view, the electronic authorization was not a means of payment at all; NYCB contends that it was only the consumer's initiation of a process in which NYCB would ask her external bank to make a payment. NYCB then reasons that the transfer of funds from the external bank to itself is the relevant "payment instrument," and the "date of receipt" is thus the date that the funds reach it (the servicer).

In order to decide whose interpretation is more true to Regulation Z, we must turn to its language and that of the Official Interpretations. Neither one defines the term "payment instrument or other means of payment," but the addition of the "other means" language tells us that it is broad. Electronic authorizations, which are an increasingly common way to pay not only mortgage payments but also a wide variety of other bills, easily fit within it. Moreover, several other statutes define the phrase "payment instrument" in a way that indicates that electronic authorizations are included. The Dodd-Frank Wall Street Reform and Consumer Protection Act explains that a "payment instrument" is "a check, draft, warrant, money order, traveler's check, *electronic instrument*, or other instrument, payment of funds, or monetary value (other than currency)." 12 U.S.C. § 5481(18) (emphasis added).

Several states have similar definitions for the phrase. See, *e.g.*, KAN. STAT. ANN. § 9-508(j) ("any electronic or written

check, draft, money order, travelers check or *other electronic or written instrument or order for the transmission or payment of money*, sold or issued to one or more persons, whether or not such instrument is negotiable") (emphasis added); MICH. COMP. LAWS ANN. § 487.1003(e) ("any electronic or written check, draft, money order, travelers check, or *other wire, electronic, or written instrument or order for the transmission or payment of money*, sold or issued to 1 or more persons, whether or not the instrument is negotiable") (emphasis added). While these provisions are not dispositive, they nevertheless are helpful as an indicator of the common understanding of an undefined term. See *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000) ("Another guide to interpretation is found in the construction of similar terms in other statutes."). And the phrase in the Official Interpretations ("payment instrument *or other means of payment*") is even more expansive than the wording of these statutes (which define merely "payment instrument"), lending further support to the conclusion that electronic authorizations are encompassed within the term. The Uniform Commercial Code gives us no reason to think otherwise: it does not contain a definition of either "payment instrument" or "means of payment." While Article 4A of the Code—which governs funds transfers—discusses "payment orders," it does not clearly specify whether electronic authorizations such as Fridman's would be classified as such an order, nor does it hint at whether we should view a "payment order" as analogous to a "payment instrument or other means of payment." See U.C.C. § 4A-103–104.

NYCB calls our attention to certain differences between electronic authorizations and checks: for example, paper

checks, unlike electronic authorizations, contain words of negotiability and the signature of the drawer. That would be a telling point if the definition we are considering were limited to negotiable instruments or it required a physical signature. But it does not. And checks are only an example of devices that qualify as a "payment instrument or other means of payment," an open-ended set. NYCB also argues that electronic authorizations are merely the first step of an electronic fund transfer (EFT). It urges that the EFT is not complete—and the payment does not "reach" NYCB as required by the Official Interpretations—until the requested funds are transferred from the consumer's external bank account to the mortgage servicer. This means, in NYCB's view, that the EFT, not the electronic authorization, is the "payment instrument or other means of payment."

The problem with that reasoning is that the same is true of a paper check, which the Official Interpretations specifically include in the definition of "payment instrument or other means of payment." Paper checks must be credited when received by the mortgage servicer, not when the servicer acquires the funds. Just like an electronic authorization, a check is in a sense "incomplete" when the mortgage servicer receives it. It is nothing more or less than the consumer's written permission to the payee to take another step—that is, to draw funds from the consumer's account—just like the electronic submission Fridman tendered. The servicer does not instantaneously have the funds promised by a paper check. It must use the banking system to have the funds transferred to it—a process that takes at least one or two days. If a check must be credited on the date of physical receipt, even though the recipient does not receive the funds

that day and must take further steps to acquire them, then there is no reason why a mortgage servicer should not face a comparable process when it receives an electronic "check" or authorization to draw funds from the consumer's bank account.

NYCB's last argument, which may be its most serious one, focuses on the final line of Official Interpretations: "If the consumer elects to have payment made by a third-party payor such as a financial institution, through a *preauthorized* payment or telephone bill-payment arrangement, payment is received when the mortgage servicer receives the third-party payor's check or other transfer medium, such as an electronic fund transfer." § 1026.36(c)(1)(i) (emphasis added). NYCB urges that the word "preauthorized" should be read to refer to the authorization that the consumer gives to her mortgage servicer so that the servicer can remove funds from her external bank account. Following that logic, NYCB argues, Fridman "preauthorized" NYCB to extract money from her Bank of America account at the moment she filled out NYCB's online form. If that was indeed the preauthorization to which the Official Interpretations refer, then the consumer would have elected to have payment made by a third-party payor pursuant to that authorization, and NYCB would be entitled to take the position that payment is received only when it receives the third-party's check or other transfer medium. In short, if NYCB's interpretation is correct, it was within its rights to refuse to credit Fridman's payment until it received the EFT (or a check) from Bank of America.

Fridman counters that NYCB's reading of the Official Interpretations is a strained one, not least because it drives a

wedge between paper checks and electronic checks. She argues that the phrase "through a preauthorized payment or telephone bill-payment arrangement" refers to an arrangement with a third party, not with NYCB itself. (For one thing, to refer to her authorization of NYCB to conduct one particular transaction as "pre"-authorization is somewhat odd.) Many financial institutions now offer automatic bill payment systems. Under those systems, the consumer arranges with her bank or other financial institution (the third-party payor) to authorize that institution in advance to pay the creditor (here, the mortgage servicer) at regularly occurring intervals. Services that allow consumers to authorize the bank to pay regularly occurring bills every month, unless and until the consumer cancels that arrangement, are widespread. Many banks provide automatic bill payment services, which permit the consumer to list bills to be paid, furnish addresses of creditors, specify how much will be paid, and so on. Consumers can also use third-party services, through which consumers grant access to their bank or credit card accounts so that the services can automatically pay their recurring bills.

We think that the more natural reading of the Official Interpretations is the one under which the reference to "preauthorized payments" addresses advance authorization with third parties, not authorizations for the mortgage servicer itself to collect the specific payment being made. If a consumer arranges with either her bank or a bill payment service to provide regular monthly payments to the mortgage servicer, then the servicer is entitled to credit the consumer's account only when it receives the check or EFT from that third-party payor. In such a situation, the servicer has no

control over the time when the consumer instructs the third-party payor to initiate the payment process, and so it is entirely reasonable to allow the servicer to wait for the arrival of the check or EFT.

The interpretation we adopt promotes an important purpose of TILA: to protect consumers against unwarranted delay by mortgage servicers. When a consumer interacts directly with a mortgage servicer (such as by delivering a check, personally paying by telephone, or filling out an electronic authorization form on a servicer's website), it is the servicer that decides how quickly to collect that payment through the banking system. Nothing dictates when the servicer must deposit the check, use the payment information given over the phone to receive payment, or place the electronic authorization information in an ACH file and collect the funds through the EPN. The servicer is in control of the timing, and without the directive to credit the payment instrument when it reaches the servicer, the servicer could decide to collect payment through a slower method in order to rack up late fees. In contrast, when a consumer interacts directly with a third-party payor to deliver payment at a set time in the future (such as through automatic bill payment services or third-party bill payment companies), the speed of the delivery of those payments is up to the third-party payor. There is no opportunity for the servicer to delay, and thus no potential strategic behavior to address. The servicer simply credits the third-party payor's payment when the servicer receives it, as directed by the last sentence of Official Interpretations § 1026.36(c)(1)(i).

The opportunity (and perhaps even incentive) to delay the crediting of accounts explains TILA's "date of receipt" requirement. Reading TILA to require mortgage servicers to credit electronic authorizations when they are received protects consumers from this unwarranted—and possibly limitless—delay. At oral argument, NYCB recognized this risk, but it argued that consumers are already adequately protected against it. It represented that it is required to batch electronic authorizations into an ACH file and request funds each business day. Moreover, it asserted that it is not allowed to charge late fees if a crash in the electronic payment network system causes a delay in the receipt of funds from consumers' bank accounts. But it is far from clear that NYCB or any other mortgage servicer is required by law to take these actions; NYCB pointed to no statute or regulation that unambiguously imposes this burden on servicers. Only TILA's requirement that servicers credit electronic authorizations when they are received provides legal assurance that consumers are not injured by delays that are out of their hands.

### III

We conclude, therefore, that an electronic authorization for a mortgage payment entered on the mortgage servicer's website is a "payment instrument or other means of payment." TILA requires mortgage services to credit these authorizations when they "reach[] the mortgage servicer." Because NYCB did not credit Fridman's account when her authorization reached it, it was not entitled to summary judgment. We therefore REVERSE the judgment of the district

court and REMAND the case for further proceedings con-
sistent with this opinion.

EASTERBROOK, *Circuit Judge*, dissenting. Elena Fridman
had a mortgage loan from NYCB. Payments were due by the
first of each month. On December 14, 2014, or 14 days late,
Fridman used NYCB's web site to request payment from her
checking account at Bank of America through Electronic
Payment Network, an automated clearing house (ACH).
That process usually takes two business days. NYCB told
Fridman that her payment would be credited on December
18, two business days hence. (December 14 was a Friday.)
Fridman acknowledged this timing, and her payment was
posted on December 18. NYCB added a late fee, and in this
litigation Fridman maintains that the fee violates 15 U.S.C.
§1639f(a).

Section 1639f(a) provides: "In connection with a consum-
er credit transaction secured by a consumer's principal
dwelling, no servicer shall fail to credit a payment to the
consumer's loan account as of the date of receipt, except
when a delay in crediting does not result in any charge to
the consumer or in the reporting of negative information to a
consumer reporting agency". (A "servicer" is the entity re-
sponsible for collecting the debt. NYCB handles its own col-
lections and is a "servicer" under the statute.)

NYCB did not receive a "payment" by the end of its 15-
day grace period. What happened on December 14 was not
"payment" but an electronic instruction directing NYCB to
request a transfer from Bank of America (and authorizing
Bank of America to remit). Money did not reach NYCB until
December 18. On this all agree. Nonetheless, Fridman main-
tains, the instruction of December 14 should be treated as
equivalent to a payment—and, although no statute requires
lenders to have grace periods, Fridman wants to combine

NYCB's 15-day forbearance with the statutory requirement that "payment" be credited immediately to produce a conclusion that the late fee is impermissible.

The statute does not define "payment." A regulation, 12 C.F.R. §1026.36(c)(1)(i), tracks the statutory language without adding a definition. My colleagues turn to commentary provided by the staff of the Consumer Financial Protection Bureau. Yet it, too, fails to define "payment." It does say, however, the "date of receipt" (a term in both the statute and the regulation) is "the date that the payment instrument or other means of payment reaches the mortgage servicer." 12 C.F.R. Part 1026, Supp. I, pt. 3 §1026.36(c)(1)(i) ¶3.

It is not clear to me that we owe this commentary any deference, as opposed to the careful consideration all agencies' views receive. The Bureau receives leeway when explaining its regulations, see *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980) (discussing the status of commentary by the Federal Reserve, which formerly administered the Truth in Lending Act), but "date of receipt" is a phrase in the statute. Why should an agency that parrots a statute in a regulation, as the Bureau did, get to make binding rules through "official commentary" that did not go through notice-and-comment rulemaking? See *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) ("the near equivalence of the statute and regulation belies the Government's argument for … deference"). Especially when the statute is implemented through litigation rather than administrative adjudication? See *Adams Fruit Co. v. Barrett*, 494 U.S. 638 (1990). Cf. *Perez v. Mortgage Bankers Association*, No. 13–1041 (U.S. Mar. 9, 2015), slip op. 10–11 n.4 and concurring opinions. But NYCB has not relied on *Gonzales* or *Adams Fruit*, and this court is not the right fo-

rum to resolve any dispute about the status of *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945), and its successors (including *Ford Motor*), so I let this pass. The question remains how a payment instruction should be treated.

An instruction is not a "payment"; NYCB was not paid until December 18. Was it a "payment instrument" such as a check? No; it was not an "instrument" of any kind. The statute, regulation, and commentary all leave "instrument" undefined, and if we turn to the payments articles of the Uniform Commercial Code we do not find any definition equating a payment *instruction* routed through a clearing house the same as a payment *instrument* such as a check. Article 4A of the UCC, which covers electronic transfers, speaks of the transaction that Fridman initiated on December 14 as a "payment order" for a "funds transfer" and never as an "instrument" (a word used in the Article on checks). Similarly, an instruction to start the process of obtaining funds from a depositary bank does not sound like a "means of payment"; if this procedure has a "means," it is the entirety of the ACH's operation, which did not produce a payment until NYCB received its credit on December 18.

The majority's tour, slip op. 7–8, through state statutes and federal opinions shows the power of electronic databases. It is linguistically possible to use "instrument" as one statute in each of Kansas and Michigan does, but this doesn't show that such a usage is normal (what of the other 48 states and the UCC?; what of all the other statutes in Kansas and Michigan?) or appropriate for this particular federal regulatory system. And if you look closely at the language quoted from the Kansas and Michigan statutes, you see that they

*contrast* "orders" for the payment of money with "instruments"; these are different ideas.

Because "payment," "instrument," and "means of payment" are not defined, my colleagues turn to another sentence of the staff's commentary:

> If the consumer elects to have payment made by a third-party payor such as a financial institution, through a preauthorized payment or telephone bill-payment arrangement, payment is received when the mortgage servicer receives the third-party payor's check or other transfer medium, such as an electronic fund transfer.

This ought to clinch the case for NYCB, because it says that "payment is received when the mortgage servicer receives the third-party payor's check or other transfer medium, such as an electronic fund transfer." It shows that the staff thinks "electronic fund transfer" different from an "instrument" and that the lender must credit the payment when it "receives the third-party payor's … transfer medium"—when the process is finished, not when it is initiated—which in this case means December 18. This is why the district court granted summary judgment in NYCB's favor.

But my colleagues do not read the sentence this way. Instead they say that a third-party transfer is credited on the date of receipt only when the payment instruction was issued by the borrower *directly* to the third party (here, to Bank of America). If the payment instruction is routed through the lender or servicer, my colleagues conclude, then this sentence of the staff commentary is irrelevant.

I don't follow this. The staff's language does not specify a difference according to who receives the payment instruction. The sentence asks when the third party's payment

reaches the lender. How the transaction begins is neither here nor there. The phrase "preauthorized payments," on which my colleagues rely (slip op. 11–12), does not do the trick. Whether the process starts with the lender or the borrower's bank, the payment is "preauthorized" in the sense that the authorization precedes the credit. A customer could authorize a payment two days, a month, or a year in advance, but all are "preauthorized."

Now let us suppose that everything I have said is wrong, and that the staff commentary not only trumps the statute but also treats a payment order as an "instrument" or "means of payment." The best analogy for that point of view would be to equate a payment instruction with the use of a debit card, which might be called a "means of payment" (though the debit card also produces an immediate transfer, unlike the delay built into the ACH system). Is a lender required to accept a debit card, or for that matter a payment order, on a par with cash? The statute does not say—but the regulation does.

Section 1026.36(c)(1)(iii) says that a servicer may require customers to pay using a menu of ways that it specifies. Thus NYCB is entitled to reject debit and credit cards. In the absence of a written policy specifying acceptable ways to pay, a servicer can reject anything other than cash, money orders, or negotiable instruments (of which checks are examples). Staff commentary on §1026.36(c)(1)(iii) at ¶3. So NYCB need not accept as statutory (and regulatory) "payment" orders that leave it with the burden of using an ACH to obtain funds from the customer's bank. The regulation recognizes, however, that a servicer may permit a method not on its authorized list (or the staff's default list). If it does

that, it may defer giving credit for as long as five days. 12
C.F.R. §1026.36(c)(1)(iii).

As far as I can see, NYCB has not put transfer via ACH
on a list of approved payments. In other words, it accepts a
payment order as a means of *producing* a payment, but not *as*
a payment. Before being allowed to enter the payment in-
struction on NYCB's web site, Fridman had to check a box
acknowledging that a funds transfer through an ACH would
not qualify as immediate payment. This brought it within
the scope of §1026.36(c)(1)(iii) and allowed NYCB to wait as
long as five days before giving credit. NYCB credited Frid-
man's account in two business days—indeed, promised cred-
it in two business days even if the ACH took longer. Frid-
man therefore cannot complain about the late charge.

My colleagues express concern that, if a lender need not
treat an ACH order as a statutory "payment" until it receives
the funds from the depositary bank, it may be tempted to
delay the start of the collection process in order to run up
late fees. Slip op. 12–13. That's not a risk for NYCB, which
promises credit in two business days no matter how long the
ACH process takes. And I do not think it likely for any other
servicer. Playing games would put its reputation at risk. Us-
ers of the Internet proclaim their grievances loudly, and
many sites rate merchants based on users' observations.

The majority's understanding can lead to bad conse-
quences too—worse, and more likely, than the possibility
that concerns my colleagues. One thing a lender may do in
response to today's decision is refuse to accept payment or-
ders. Then a borrower such as Fridman would either have to
write a paper check, taking all risk of delay in the mails, or
go to her own bank's web site to cause it to make a funds

transfer (something that, the majority acknowledges, would allow the lender to defer credit until the money arrives).

A second thing a lender could do would be to reduce or eliminate grace periods. NYCB now gives its customers 15 days past the deadline to make payments without incurring charges. Under NYCB's procedures, a borrower who wants to use an ACH collection must act within the first 13 of those days to avoid a late fee. If as my colleagues hold a lender must give the borrower credit the same day a payment order is received, that turns 15 grace days to 17 (or 19 with weekends). The lender can cut the time back to 15 by reducing the grace period to 13 or 11 days. But that's hard to remember. A reduction to 10, 7, or zero would be more likely. Customers would lose.

Consequences, good or bad, are the province of Congress and the Bureau. Our job is to interpret the statutory and regulatory language. Instead of stretching that language in a way that may induce lenders to reduce or eliminate grace periods, or stop facilitating ACH transfers, we should read the statute and regulation to mean what they say: lenders must give credit when they receive payment. NYCB gave Fridman credit the day it received payment. It has complied with the statute.